FIRST EMPIRE BANK–NEW YORK (by its successor in interest Manufacturers & Traders Trust Co. of Buffalo, New York, a New York Banking Corporation), and Societe Generale, a French Banking Corporation, Plaintiffs-Appellants,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION and Federal Deposit Insurance Corporation as Receiver of United States National Bank, Defendants-Appellees.

FEDERAL DEPOSIT INSURANCE CORPORATION and Federal Deposit Insurance Corporation as Receiver of United States National Bank, Counterclaimants-Cross-Appellants,

v.

FIRST EMPIRE BANK–NEW YORK and Societe Generale, Counterdefendants-Cross-Appellees.

Nos. 77–2090 and 77–2147.

United States Court of Appeals, Ninth Circuit.

April 6, 1978.

As Amended April 10, 1978.

Don A. Proudfoot, Jr., Graham & James, Long Beach, Cal., for plaintiffs-appellants.

Charles A. Legge, of Bronson, Bronson & McKinnon, San Francisco, Cal., Richard R. Gore, of Schall, Boudreau & Gore, San Diego, Cal., for defendants-appellees.

Before BROWNING and MERRILL, Circuit Judges, and HARPER,* District Judge.

MERRILL, Circuit Judge:

This case arises out of the insolvency and receivership of the United States National Bank of San Diego (USNB). The Federal Deposit Insurance Corporation (FDIC), as Receiver, entered into an agreement with Crocker National Bank for purchase by Crocker of selected assets of USNB and assumption by Crocker of certain of the bank's obligations, including deposits. This suit was brought by creditors of USNB, whose claims had not been assumed by Crocker. They contend that Crocker's assumption, carrying with it assurance of payment in full of the claims assumed, amounted to a distribution by the Receiver in which the plaintiffs were entitled by law to share ratably. Accordingly they seek to recover from the FDIC the amount of their claims in full. They here appeal from judgment rendered by the district court in favor of the FDIC.

Appellants' claims arise out of standby letters of credit issued by USNB in connection with loans made by appellants to customers of USNB. The FDIC contends that these claims were contingent, and were not debts of USNB at the time of its insolvency or at the time it was placed in receivership. The FDIC contends that for that reason the claims were not provable in the receivership. It cross appeals from judgment of the district court holding the claims to be provable.

The facts bearing on the appeal and cross appeal will be more fully discussed below.

I. *FACTS*

A. *The FDIC and Insolvent Banks*

The FDIC, under the Federal Deposit Insurance Act (FDIA), is given the duty of insuring to $40,000 each deposit made in national banks that are members of the Federal Reserve System, 12 U.S.C. §§ 1811, 1813(m), 1821(a), (f). From assessments paid by the insured banks an insurance fund has been created, 12 U.S.C. § 1821(a), from which the FDIC meets its responsibilities as insurer. In this respect, § 1821(f) provides in part:

"Whenever an insured bank shall have been closed on account of inability to meet the demands of its depositors, payment of the insured deposits in such bank shall be made by the Corporation as soon as possible * * * either (1) by cash or (2) by making available to each depositor a transferred deposit in a new bank in the same community or in another insured bank in an amount equal to the insured deposit of such depositor."

* Honorable Roy W. Harper, Senior United States District Judge for the Eastern District of Missouri, sitting by designation.

It is the Comptroller of the Currency who, under the National Bank Act, is empowered to place a national bank in receivership. This he may do whenever he "shall become satisfied of the insolvency" of a bank. 12 U.S.C. § 191. Since enactment of the FDIA the receiver appointed by the Comptroller for national banks must be the FDIC. 12 U.S.C. § 1821(c).

This places the FDIC in the unusual position of acting in two capacities with respect to national banks closed by the Comptroller: in its corporate capacity, as insurer of deposits (in which respect we, as does the FDIA, shall refer to the FDIC as "the Corporation"), and in its capacity as receiver (in which respect we shall refer to it as "the Receiver"). This duality requires the FDIC frequently to deal with itself, e. g., to lend or sell to itself. The prayer of the complaint in this case seeks to require the FDIC as the Corporation to stand good for acts of the FDIC as the Receiver.

Under the FDIA the Corporation, through its board of directors, is authorized to take action to assist a failing bank with the hope that it may be able to avert the bank's closure and the drastic economic effect that closure might have on the community served by the bank. 12 U.S.C. § 1823(c) and (e). One form of relief often resorted to for this purpose is the purchase and assumption agreement. By such an agreement the Corporation encourages the failing bank to agree to a takeover of its business by a sound bank. This involves an assumption by the acquiring bank of the failing bank's deposit and commercial obligations and a purchase of its assets. Where the assets are found to be less in value than the outstanding obligations, the Corporation is authorized by the FDIA to lend to the failing bank such a sum of money, to be passed on to the acquiring bank, as would bring the assumption and purchase into balance. 12 U.S.C. § 1823(e). The Corporation may take a lien on any assets remaining in the receivership to secure its loan. *Id.*

The Corporation realistically recognizes that it may not come out in the black on such a transaction. However, the question faced by the Corporation's board of directors is whether the arrangement is likely to be less costly than the bank's closure, which otherwise is the probable result, with the expense to the Corporation of compensating the insured depositors which would necessarily follow. 12 U.S.C. § 1823(e); *see* Bransilver, *Failing Banks: FDIC's Options and Constraints*, 27 Ad.L.Rev. 327 (1975).

The purchase and assumption agreement also can be resorted to by a bank already failed and in receivership, in which case the Corporation deals not with the failing bank but with itself as Receiver. This is what occurred in the case of USNB.

### B. The Insolvency of USNB

In August, 1973, the Comptroller advised the FDIC that USNB was in poor financial condition and might have to be closed. The FDIC was provided with examination reports of USNB and other financial information available through the Comptroller's office. After analyzing the financial information, and information regarding the control of USNB, the FDIC decided that it had two relevant alternatives under the Act: (1) it could simply wait until USNB was closed by the Comptroller, and then pay the insured depositors up to the then $20,000 statutory limit and liquidate the bank; or (2) it could attempt to find a bank to purchase USNB's assets and assume its liabilities.

The consequences of liquidation were awesome. All of USNB's sixty-two offices, located throughout five southern California counties, would have to be closed and the value of uninterrupted operation of the offices would be lost. All checks drawn on USNB accounts would have to be dishonored, causing harm not only to the account holders but also to those persons to whom the account holders had written checks. The accounts of over 300,000 depositors in USNB would have to be held in suspense for a time long enough to permit the FDIC to compile records, offset the deposits with the liabilities, 12 U.S.C. § 1813(m), and pay the insurance, 12 U.S.C. § 1821(f). Insured depositors would receive only a maximum of $20,000, and a large percentage of the deposits were over that amount. Deposi-

tors and creditors would then receive only distributions from the liquidation of USNB's assets over a lengthy period of years. USNB had approximately one billion, two hundred and fifty million dollars in book values of assets and liabilities. It had deposits of $930 million. It had a trust department with assets under management of approximately $156 million. It had 344,000 separate deposit accounts. Approximately $300 million of those deposits were not insured. Innumerable legitimate borrowers were relying on USNB as a continuing source of credit to finance their businesses.

Faced with these consequences, the Board of Directors of the FDIC decided to attempt to find another bank to participate in a purchase and assumption transaction on such terms as would reduce the risk of loss to the Corporation.

It was first necessary to formulate the transaction in such a manner as would prove attractive to interested banks, so that competitive bidding among such banks would minimize the losses of the FDIC. To this end representatives of qualified and interested banks were invited to join with the Corporation in a discussion designed to fix the conditions of a purchase and assumption agreement. It became immediately apparent that certain assets and liabilities of USNB were not readily acceptable to the banks. These were assets and liabilities connected with the bank's controlling shareholder, C. Arnholt Smith, and certain USNB shareholders and companies associated with him. The banking transactions of the members of this group, referred to by the FDIC as the "Designated Group," were regarded as suspect. Many interested persons attributed USNB's failure in large part either to mismanagement by the Designated Group or to their misuse of official power for personal gain, and charges were then under investigation by the Securities and Exchange Commission and the Internal Revenue Service. The members of the Designated Group individually were substan-

tially indebted to USNB and the bank had issued standby letters of credit on their behalf to other banks that had lent money to group members. The consensus of the banks consulted by the Corporation was that the financial status of the Designated Group members was such that their obligations to USNB were of questionable value as assets, and that the assumption of liability on the standby letters of credit presented an unacceptable banking risk. Accordingly, the banks rejected such obligations as purchasable assets unless the Corporation would guarantee their value; they refused to assume the letters of credit as obligations unless in each case they had from the Corporation a guarantee of the obligation of the account party to the creditor bank as an offsetting asset.

The Corporation, faced with this ultimatum, refused to guarantee the value of these obligations.[1] It did not question the legal enforceability of the letters against USNB. However, it did not regard this as the controlling consideration. Instead it focused on the desirability of permitting the account parties to have their debts to the creditor banks paid out of the Corporation's jealously guarded deposit insurance fund. It felt that by guaranteeing the letters of credit it would be using the deposit insurance fund to make good "tainted" transactions of the Designated Group. Consequently, the purchase and assumption agreement as ultimately formulated did not include as purchased assets the obligations of members of the Designated Group or, as assumed obligations, the standby letters of credit issued to creditors of the group members. The transaction thus formulated was offered to the banks for competitive bid.

On October 18, 1973, USNB was closed by the Comptroller and the FDIC was appointed Receiver. Crocker National Bank, bidding $89.5 million for the value of USNB as a going concern, emerged as the acquiring bank and the following morning all USNB facilities, except its Nassau, Bahamas of-

---

1. The Corporation is authorized to make such a guarantee under 12 U.S.C. § 1823(e), which provides that "the Corporation * * * may guarantee any other insured bank against loss by reason of its assuming the liabilities and purchasing the assets of an open or closed insured bank."

fice, opened as branches of Crocker National Bank.

To implement the purchase and assumption agreement the Corporation lent to the Receiver the sum of $128,780,000 representing the difference between the amount of obligations assumed by Crocker and the value of the assets purchased, less the premium paid. To secure this loan the Corporation took a lien, prior to the claims of the remaining creditors of the receivership, on the unpurchased assets remaining in the receivership. The sum so lent was passed to Crocker by the Receiver along with the purchased assets.

## II. CROSS APPEAL OF FDIC

The FDIC has cross appealed from the rejection of its counterclaim against appellants and from the holding that appellants' claims were provable against the receivership estate. We consider this issue first because if the FDIC prevails and the letters are held not to be provable, appellants are without standing to advance the contentions they make in their appeal.

When USNB closed, the Receiver made demands upon appellants for deposits of USNB held by the appellant banks. Appellants refused to meet the Receiver's demands and retained the deposits to offset them against the amounts owed to them by USNB on the standby letters of credit. The FDIC filed a counterclaim in this action for the return of the deposits. The district court, holding the letters of credit to be provable, allowed appellants to set off their obligations against the amounts due on the letters of credit and rejected the counterclaim. The Receiver contends that this was error. It seeks not only to avoid liability on the letters of credit but also to recover from appellants the sums owed to USNB on the offset claims.

### A. Nature of Letters of Credit

Preliminarily a word should be said with respect to the nature of the standby letter of credit—the commercial instrument upon which appellants' claims are based.

The Receiver has acknowledged that some letters of credit issued by USNB did create provable claims and included these letters in the obligations assumed by Crocker in the purchase and assumption agreement. These were primarily traditional or commercial letters of credit.[2] This type of instrument developed as a means of facilitating international trade between distant buyers and sellers not commercially acquainted with each other.

"Stripped to its essentials, the transaction runs as follows: the buyer arranges for a bank—whose credit the seller will accept—to issue a letter of credit in which the bank agrees to pay drafts drawn on it by the seller if, but only if, such drafts are accompanied by specified documents, such as bills of lading or air freight receipts, representing title to the goods that are the subject matter of the transaction between buyer and seller. The bank undertakes this obligation for a specified period of time."

Verkuil, *Bank Solvency and Guaranty Letters of Credit*, 25 Stan.L.Rev. 716, 718 (1973) (hereinafter "Verkuil").

This letter of credit creates an absolute, independent obligation and payment must be made upon presentation of the proper documents regardless of any dispute between the buyer and seller concerning their agreement, such as a dispute over the quality of the goods delivered. *See*, Battaile, *Guaranty Letters of Credit: Problems and Possibilities*, 16 Ariz.L.Rev. 823, 825 (1974) (hereinafter "Battaile"); *Association de Azucareros de Guatemala v. United States Nat'l Bank of Oregon*, 423 F.2d 638, 641 (9th Cir. 1970).

In recent years instruments operating as letters of credit (in that they operate to

---

**2.** Letters of credit of this type were the subject of an earlier action against the Receiver in the USNB receivership that ultimately reached this court. *International Westminster Bank, Ltd. v. FDIC*, 509 F.2d 641 (9th Cir. 1975). The ques-

tions presented by this appeal were not reached in that case which was concerned only with whether the complaint adequately alleged equity jurisdiction to justify the injunctive and declaratory relief sought. 509 F.2d at 644–45.

create an absolute obligation upon presentation of specified documents) and termed "standby" to distinguish them from the traditional letters of credit have been used as security devices in a variety of contexts outside the traditional area of the international sale of goods. They have been used to insure construction loans, as quasi-performance bonds, to support the issuance of commercial paper and to secure the performance of purely monetary obligations such as those involved in this case. *See* Battaile, *supra* at 822–26; Verkuil, *supra* at 717, 721–22. Standby letters are convenient and inexpensive and are being adapted to many uses at this time. *See* Verkuil, *supra* at 717. The principal difference between the traditional letter of credit and these newer standby letters is that "whereas in the classical setting, the letter of credit contemplates payment upon performance, 'the standby credit,' * * * 'contemplates payment upon failure to perform.'" Katskee, *The Standby Letter of Credit Debate—the Case for Congressional Resolution*, 92 Banking L.J. 697, 699 (1975) (hereinafter "Katskee").

This has created an awkward situation for national banks, since the standby letter of credit possesses more of the characteristics of a guarantee and national banks are not authorized to enter into guarantees. *See* Katskee, *supra* at 712–14; Harfield, *The Standby Letter of Credit Debate*, 94 Banking L.J. 293, 301–03 (1977). No contention is made here, however, that issuance of the letters of credit in question was ultra vires. The Receiver has not asserted that defense and the Comptroller appears to have chosen instead to recognize the widespread bank use and commercial usefulness of the instrument and to attempt, by regulation, to eliminate the abuses which the failure of USNB has demonstrated can result from unregulated and excessive use. FDIC Reply Brief at 5–6; *see, e. g.*, 12 C.F.R. § 7.7016 (1977).

### B. *Provability of Standby Letters of Credit*

[2] The Receiver contends, nevertheless, that standby letters of credit, whether ultra vires or not, are not provable in a national bank receivership, since, it asserts, claims against the receiver of a national bank are not provable if they were contingent on the date of the bank's insolvency. Although the case law is quite limited, where commentators have made such statements of the law, *e. g.*, 9 C.J.S. *Banks and Banking* § 755, they are found to rest on cases involving a lessor of property leased to the bank who is asserting a claim against the receiver to recover liquidated damages for loss of future rent.

*Kennedy v. Boston-Continental Nat'l Bank*, 84 F.2d 592 (1st Cir. 1936), *cert. dismissed*, 300 U.S. 684, 57 S.Ct. 667, 81 L.Ed. 887 (1937), was such a case. There the lessor, following default by the national bank lessee, sought to exercise an option given him by the lease to obtain as liquidated damages the difference between the fair rental value of the property for the balance of the lease and the rental provided by the lease. The court held the claim not provable, relying on contract principles which reasoned that exercise of the option by the lessor created a new contract which came into being at the time of re-entry by the lessor. This court has followed *Kennedy* in a case also dealing with an exercise of option to obtain liquidated damages for loss of future rent, *Argonaut Savings and Loan Ass'n v. FDIC*, 392 F.2d 195, 197 (9th Cir.), *cert. denied*, 393 U.S. 839, 89 S.Ct. 116, 21 L.Ed.2d 110 (1968). *Accord, FDIC v. Grella*, 553 F.2d 258, 262 (2d Cir. 1977).

Although these cases use broad language, indicating that the bank's liability on any claim must have accrued and be unconditionally fixed at the date of insolvency, they are, by virtue of their dependence on the "new contract" principle, distinguishable from cases not dealing with lease options exercised after insolvency. The claims here are based on letters of credit that were in existence before insolvency and are not dependent on any new contractual obligations arising later.

We note that at the time *Kennedy* was decided claims for future rent in bankruptcy were handled in a manner different from

that by which other contingent obligations were handled. Although contingent contract liabilities were provable in bankruptcy, "the courts stopped short of extending the same liberality of view to claims based on leases." 3A Collier on Bankruptcy § 63.32[3] at 1927. This "remnant of medieval theory" is the basis for the statement in *Kennedy* that exercise of the right to re-entry amounted to creation of a new contract arising after insolvency. *Id.* at 1927–28. Shortly after the decision in *Kennedy,* the bankruptcy rules were liberalized to allow proof of a landlord's claim, although leases remained (and still remain) in a category apart from other contract claims, even in the present bankruptcy rules. *See id.* at § 63.31[1] at 1915–16, § 63.32[5] at 1931–32; 11 U.S.C. § 103(a)(9).

The dissenting judge in *Kennedy* noted that the allowance of the claim "depends on whether the equity rule or bankruptcy rule of provability should be followed" in a national bank's receivership. 84 F.2d at 598. His statement and the cases cited in the opinion indicate that the majority was relying on the now outdated bankruptcy rules in reaching its decision that the claims were not provable.

■ We conclude that the holdings of *Kennedy* and *Argonaut* should be limited to cases involving leases and loss of future rent and should not be extended to other contingent obligations. To follow those cases here would amount to extending into new areas a rule that now appears to be outmoded, based as it is on a bankruptcy rule that today has been repealed in favor of the contrary equity rule.

Although the authority against the provability of these letters is thus distinguishable, there is little positive authority to support a holding that they are provable in national bank receiverships. There is authority holding such claims provable in general equity receiverships and in bankruptcy, as we shall discuss, but the only case dealing with the question in the context of national bank receiverships is *Pinckney v. Wylie,* 86 F.2d 541 (5th Cir. 1936). There a claim based on a bank's obligation as a surety for another's debt was asserted

against a receiver of a national bank. The principal issue was whether the claimant was entitled to a ratable distribution based on the full amount of the debt or on the amount of the debt after crediting the proceeds from the sale of the security for the loan. 86 F.2d at 542. In deciding the amount of the claim, the court necessarily recognized that a claim based on a bank's obligation as surety or guarantor is provable, although it did not discuss the issue.

■ The result in *Pinckney* is consistent with the bankruptcy rules and equitable receivership principles governing the provability of contingent claims. Claims based on surety or guarantee obligations of a bankrupt are clearly provable as contingent contract obligations, 11 U.S.C. § 103(a)(8). 3A Collier on Bankruptcy, § 63.19 at 1876. Even before the bankruptcy statute was amended to specifically state that contingent contract claims are provable, courts held suretyship and guarantee claims provable, stating "[e]ven though not due until after the year allowed for proof of claims, if proved in time, such a claim may be liquidated as are other unmatured claims." *Maynard v. Elliott,* 283 U.S. 273, 279, 51 S.Ct. 390, 392, 75 L.Ed. 1028 (1931) (and see cases cited therein).

■ This bankruptcy rule of provability seems consistent with the principles governing equitable receiverships. Under equitable principles the court must consider:

> " * * * on the one hand, the substantial right of all creditors to share in their debtor's property, and, on the other, the necessity for expeditious administration and, giving due consideration to both, must make rules which are practicable as well as equitable."

*Penn. Steel Co. v. New York City Ry. Co.,* 198 F. 721, 738 (2d Cir. 1912). The court in *Penn. Steel* divided all claims into three classes:

> "(1) Claims which at the commencement of proceedings furnish a present cause of action;
>
> (2) Claims which at that time are certain but which are not matured:

(3) Claims which are contingent."

*Id.* at 738. The first two classes are clearly provable but the third class of contingent claims must be divided into two subclasses:

"(1) Claims of which the worth or amount can be determined by recognized methods of computation at a time consistent with the expeditious settlement of the estates;

(2) Claims which are so uncertain that their worth cannot be so ascertained."

*Id.* at 739–40. The latter class cannot be proved, but the claims in the former class are provable. *Id.*

The court in *Penn. Steel* found no equitable reason why the time of appointment of the receiver should determine the provability of claims, and held that:

"Claims which when presented within the time limited by the court for their presentation are certain or are capable of being made certain by recognized methods of computation, should be allowed. Claims which are not then certain should be disallowed because they afford no basis for making dividends. *But there is no equitable reason why claims which are certain when presented and which are presented in time should have been certain at some arbitrary anterior period.*"

Id. at 741–42 (emphasis supplied). We agree with that statement.

The claims at issue here would be considered provable under these equitable principles because the liability on the standby letters of credit was absolute and certain in amount when this suit was filed against the Receiver. By that time, the principals had defaulted on the primary loan obligations. The claims against the Receiver were made in a timely manner, well before any distribution of the assets of the receivership, other than the distribution made through the purchase and assumption agreement.

Finally we note that the Receiver seems already to have acted upon the assumption that standby letters of credit are, in principle, provable. Some such instruments were actually assumed by Crocker with FDIC approval, and thus those creditors were assured payment in full. These were letters where Crocker was willing to accept the obligation of the account party to the creditor bank as an offsetting asset. Thus, it was not the "taint" of membership in the Designated Group that rendered the letters of appellants unacceptable to Crocker. It was the fact that the obligation was certain to accrue. It was in such cases that Crocker insisted upon the FDIC's guarantee.

We conclude that the claims of appellants were provable in face amount in the receivership.

### III. APPEAL OF FIRST EMPIRE BANK AND SOCIETE GENERALE

#### A. Ratable Distribution Under the NBA

Appellants contend that the purchase and assumption agreement amounted to a preference of the creditors whose obligations were assumed, contrary to the provisions of the National Banking Act (NBA), 12 U.S.C. § 91, which provides in part: "[A]ll payments of money * * * made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in a manner prescribed by this chapter, or with a view to the preference of one creditor to another * * * shall be utterly null and void * * *."

Appellants further contend that the purchase and assumption agreement amounted to a distribution to those whose claims were assumed by Crocker, and that such distribution was not "ratable" as required by the NBA, 12 U.S.C. § 194, which reads in part as follows:

"From time to time, after full provision has been first made for refunding to the United States any deficiency in redeeming the notes of such association, the comptroller shall make a *ratable dividend* of the money so paid over to him by such receiver on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction * * *." (emphasis supplied).

Appellants contend that under the FDIA, §§ 91 and 194 of the NBA apply to the FDIC as Receiver. Section 1821(d) of the FDIA provides in part:

"Notwithstanding any other provision of law, it shall be the duty of the Corporation as such receiver * * * to wind up the affairs of such closed bank *in conformity with the provisions of law relating to the liquidation of closed national banks*, except as herein otherwise provided." (emphasis supplied).

■ The Receiver contends that § 91 does not apply to banks in receivership, but only to preclosure transactions. It contends that § 194 does not apply to it[3] and that § 1821(d) excuses it from the provisions of § 194 when it is engaged in assisting in the takeover of a closed bank. It points out that the language of § 1821(d) (on which appellants rely as applying the NBA to the Receiver) contains an exception: "except as herein otherwise provided." As provision to the contrary, the Receiver relies on § 1823(e), which explicitly authorizes the Corporation to make loans implementing purchase and assumption agreements and which provides in part:

"Whenever in the judgment of the Board of Directors such action will reduce the risk or avert a threatened loss to the Corporation and * * * will facilitate the sale of the assets of an open or closed insured bank to and assumption of its liabilities by another insured bank, the Corporation may, *upon such terms and conditions as it may determine*, make loans secured in whole or in part by assets of an open or closed insured bank, which loans may be in subordination to the rights of depositors and other creditors * * * Any insured national bank or District bank, or the Corporation as receiver thereof, is authorized to contract for such sales or loans and to pledge any assets of the bank to secure such loans." (emphasis supplied).

The FDIC contends that under this language, when engaged as the Corporation or as Receiver, in accomplishing a takeover by a purchase and assumption agreement, it is authorized to act upon such terms and conditions as it may determine without any restriction such as is imposed by § 91 or 194. It concedes that it must act "reasonably." It contends that in rejecting the claims of banks that were so unwise as to extend credit to members of the Designated Group on standby letters of credit issued by USNB, and in refusing to subject its deposit insurance fund to payment of sums owed by members of that group, it was acting reasonably.

The district court agreed that the FDIC had acted reasonably and held that the purchase and assumption agreement did not violate § 91 and § 194 of the NBA. No relevant authority has been cited to us and we have found none. Since passage of the FDIA very few national banks have failed, due, without doubt, to the efficient operations of the Comptroller and the FDIC. Court-made law is, accordingly, sparse. However, we are unable to accept the contentions of the FDIC.

■ In our judgment § 1823(e) cannot be read to excuse the FDIC as the Receiver from complying with the provisions of the NBA. The clause emphasized, upon which the Receiver relies, refers to the FDIC in its corporate capacity. The terms and conditions it has reference to are those conditions of loans and sales that would, in the judgment of the board of directors, qualify the agreement as action that would "reduce the risk [of loss] or avert a threatened loss to the Corporation." The FDIC points to the final sentence of the first paragraph of § 1823(e), set forth above, as indicating that the subsection has the Receiver in mind

**3.** The FDIC also suggests that since this was not the ordinary kind of distribution of assets in a receivership but a method of satisfying claims which is expressly authorized by the FDIA, the NBA requirement of ratable distribution should not apply. It contends that only those few assets remaining in the receivership are subject to the ratable distribution requirement. We cannot agree. It is the proceeds of a purchase of receivership assets that must be

ratably distributed under § 194. Here receivership assets (including the cash borrowed from the Corporation) were sold in exchange for Crocker's assumption of debts. That assumption, then, as proceeds of the sale, constitutes a distribution of assets which must give ratable recognition to the rights of creditors of the receivership. *Ex parte Moore*, 6 F.2d 905, 909 (E.D.S.C.1925); *see Gockstetter v. Williams*, 9 F.2d 354 (9th Cir. 1925).

throughout and that the emphasized clause thus should apply to acts of the Receiver. We do not so read it. That sentence serves to enable closed or failing banks to contract with the Corporation and includes in its enablement the FDIC as Receiver of such banks. Thus the Receiver is taken note of only in so far as to recognize that it can contract with the Corporation. It is not, however, excused from behaving like a receiver when it does so act.

■ The FDIA did not create the concept of a purchase and assumption agreement. Before the FDIC was created, receivers of insolvent banks had entered into purchase and assumption agreements under the provisions of the NBA authorizing receivers to deal with receivership assets: 12 U.S.C. §§ 192, 194. *See, Gockstetter v. Williams*, 9 F.2d 354, 355–56 (9th Cir. 1925); *Ex parte Moore*, 6 F.2d 905, 906–07 (E.D.S.C.1925); *Hulse v. Argetsinger*, 18 F.2d 944 (2d Cir. 1927). Congress in enacting the FDIA thus noted a pre-existing practice. We find nothing to suggest that in doing so Congress intended the FDIC to be free from the requirements of § 91 and § 194 by which prior receivers had been bound in the formulating and execution of agreements.

To accede to the FDIC's contentions would seriously undermine the policy firmly set forth in § 91 that some creditors are not to be preferred over others, and of § 194 that when distributions are made they shall be ratably made. Under its interpretation of the statutes, the FDIC could (subject only to its concession that it must act "reasonably," but without any apparent applicable standard), pick and choose which creditors should be preferred, or permit the acquiring bank to pick and choose.

In this case the extraordinary extent of the lack of equal treatment is emphasized by the fact that the unassumed creditors, left with only a claim against the undesirable assets of USNB remaining in the receivership, do not even have that questionable source of recovery unimpaired. They are subordinated to the lien of the Corporation to secure its loan of money to the Receiver, all of which went to Crocker to make possible the advantage to the assumed creditors. This lien would without doubt consume in full the remaining assets, leaving the unassumed creditors without any recovery whatsoever. Thus, even as to the remaining assets the assumed creditors would seem, indirectly, to have got there first and to have cut the remaining creditors out.

■ In our judgment it could not have been the congressional intent, upon balance, to have the fiscal integrity of the deposit insurance fund (which can be adequately protected by other more equitable means) outweigh the policy of equitable and ratable payment of creditors in this manner and to permit the FDIC, whenever it felt its action to be reasonable and to serve to protect the deposit insurance fund against loss, to prefer some creditors over others— paying some in full while others received little or nothing.

■ This is not to say that every purchase and assumption agreement must include every creditor in order to be valid. If the purchase leaves sufficient assets in the receivership to allow distribution to unassumed creditors equal to that undertaken by the acquiring bank as to the creditors it has accepted, distribution still could be ratable. *See White v. Knox*, 111 U.S. 784, 785, 4 S.Ct. 686, 28 L.Ed. 603 (1884). The FDIC may prefer to take this chance. It must, however, stand ready to render the distribution ratable—to supplement the remaining assets should they fall short and to surrender its lien when necessary.

■ We conclude that the responsibility lies on the FDIC under § 194 to compensate appellants for its failure as Receiver to make distributions ratably. Had it insisted that these appellants be included in the purchase and assumption agreement as creditors with claims assumed by Crocker, as it should have done, it would then have had to satisfy Crocker by adding to the amount borrowed from the Corporation and paid to Crocker the full amount of the claims. That sum appellants are now entitled to receive from the FDIC.

### B. Interest

The question here is whether appellants should recover interest upon their claims. The FDIC contends that to allow recovery of interest would be to permit increase of the claims over their amounts at the time of receivership. It relies on *White v. Knox*, 111 U.S. 784, 4 S.Ct. 686, 28 L.Ed. 603 (1884). In that case a creditor recovered a judgment against a national bank after the bank was declared insolvent. The judgment included the amount of his claim with interest added to the date of judgment. The claimant sought a ratable distribution on the full amount of the judgment including interest, but the Comptroller refused to recognize interest added between the insolvency and the judgment and paid a ratable dividend only on the amount of the claim as of the date of insolvency. 111 U.S. at 785, 4 S.Ct. 686. The Supreme Court agreed with the Comptroller, holding that the claimant was only entitled to a ratable distribution based on the value of the claim on the date of insolvency, "because the dividends to the other creditors had been calculated in that way, and all he was entitled to was a share in the proceeds of the assets equal to what had been distributed to others during the pendency of his litigation." 111 U.S. at 786, 4 S.Ct. at 686.

■ The purpose of the rule disallowing interest accruing after insolvency is to lend support to the concept of ratable distribution: that ratable distribution should be made to the creditors on the basis of what was due to them at the time of the insolvency. However, a difference must be recognized between the case where interest accruing after insolvency is added to become a part of the claim itself and the case where interest is awarded in addition to the amount of the claim for failure of the receiver to pay the claim when it became due or to include the claim in a distribution in which it was entitled ratably to share.

Noting this distinction, the Court in *Armstrong v. American Exchange Nat'l Bank*, 133 U.S. 433, 470, 10 S.Ct. 450, 33 L.Ed. 747 (1890), allowed interest on a claim from the date on which the distribution to the claimant should have been made. Similarly, in *Ticonic Nat'l Bank v. Sprague*, 303 U.S. 406, 58 S.Ct. 612, 82 L.Ed. 926 (1938), the Court held that:

> "It is true that in the liquidation of national banks, dividends from the general funds on unsecured claims are made pro rata upon the amount of each claim as of the date of the insolvency * * * It is in order to assure equality among creditors as of the date of insolvency that interest accruing thereafter is not considered. *But interest is proper where the ideal of equality is served, and so a creditor whose claim has been erroneously disallowed is entitled on its allowance to interest on his dividends from the time a ratable amount was paid other creditors.*"

303 U.S. at 411, 58 S.Ct. at 614 (emphasis supplied).

■ To be accorded the required equal treatment among creditors, appellants were entitled to a ratable dividend of 100 percent of the value of each letter of credit on the date each letter matured. Because such a ratable distribution was not made, appellants are entitled to recover the interest accruing on each letter from the date of its maturity, the dates on which the distribution would have been made had all the claims been ratably treated. *Ticonic Nat'l Bank v. Sprague, supra,* 303 U.S. at 411, 58 S.Ct. 612.

### JUDGMENT

On the cross appeal of the FDIC, the judgment of the district court holding appellants' letters of credit to be provable claims in face amount is affirmed.

On the appeal of First Empire Bank and Societe Generale, the judgment of the district court is reversed and the case is remanded with instructions that judgment be entered in favor of each appellant in the amount of the face value of each USNB letter of credit held by it, plus interest from the dates of maturity, less the amount of any USNB deposit held by it.