FEDERAL DEPOSIT INSURANCE CORPORATION, a United States Corporation, Plaintiff,

v.

Nicholas LESSELYOUNG, Defendant.

FEDERAL DEPOSIT INSURANCE CORPORATION, a United States Corporation, Plaintiff,

v.

Henry S. LAUTERBACH, Defendant.

FEDERAL DEPOSIT INSURANCE CORPORATION, a United States Corporation, Plaintiff,

v.

John DEBELAK, Defendant.

Nos. 76–C–340, 341 and 342.

United States District Court, E. D. Wisconsin.

Sept. 14, 1979.

John W. Hein, Gibbs, Roper, Loots & Williams, Milwaukee, Wis., for plaintiff.

Ronald L. Wallenfang, Quarles & Brady, Milwaukee, Wis., for defendant.

## MEMORANDUM AND ORDER

WARREN, District Judge.

The three above-encaptioned civil actions are brought by the Federal Deposit Insurance Corporation (FDIC) as the holder of three notes. Each defendant named above executed a note payable to the American City Bank. These three notes are the subject of this action. In each of the three above-encaptioned cases, the FDIC has moved for summary judgment.

Although these actions were not consolidated, the summary judgment motions are being considered together since the defendants have each raised the same defenses and were similarly related to American City Bank, the payee on the notes in issue. Furthermore, each defendant is represented by the same attorney, who submitted almost identical briefs in each of the three cases.

In order to protect defendants' rights, however, where appropriate, each defendant will be discussed separately.

All three defendants admit executing notes payable to the order of the American City Bank & Trust Company, N.A., all three of which were due April 28, 1976. The DeBelak note was in the principal sum of $318,181.12. The Lauterbach note was in the principal sum of $154,958.34. Finally, the Lesselyoung note was in the principal sum of $137,396.39. Each defendant admits not having made any payments of principal or interest.

The FDIC in its corporate capacity became the holder of the notes in issue following the liquidation of the American City Bank (American). Subsequent to declaration that American was insolvent, the FDIC was appointed as receiver of American. As receiver, the FDIC entered into a purchase and assumption agreement with the Marine National Exchange Bank of Milwaukee, whereby the Marine agreed to assume certain of American's liabilities in exchange for certain assets. In order to facilitate the purchase and assumption agreement with Marine, the FDIC, in its corporate capacity, purchased certain of the assets of American. Among the assets purchased were the three notes in issue. The purchase and assumption agreement was approved, ex parte, by this Court on October 21, 1975. *Matter of American City Bank & Trust Company, N.A.*, 402 F.Supp. 1229 (E.D.Wis. 1975).

Defendants have each asserted the same defenses, several of which were incorporated from the pleadings in *Colonial Bank & Trust Co. v. American Bankshares Corp.*, 439 F.Supp. 797 (E.D.Wis.):

    1. Each defendant denies that he received value for the note.

    2. Each defendant asserts that the transfer of the note to the FDIC was ineffective by reason of

      (a) it being approved by this Court ex parte,

      (b) the failure of the FDIC to assume liabilities of American City Bank, and

(c) the alleged failure of the Receiver to receive value for the transfer.

3. Each defendant asserts that delivery of his note was induced by the fraud of American City Bank and the FDIC in a prior stock purchase financed through a loan subsequently repaid with the proceeds of the note sued upon. Specifically defendants each allege that in December of 1974 he was induced to buy stock in Bankshares, the parent of American City Bank, by bank officers who misrepresented that

(a) the bank's loan loss reserves were adequate

(b) the correct volume of loans had been placed in non-accrual of interest status. (Col. Cross-Claim ¶ 17),

(c) the purchase of stock would discharge his director's liability for bank "overlines" (Col. Cross-Claim ¶ 19), and

(d) the infusion of capital demanded by the Comptroller would make the bank viable (Col. Cross-Claim ¶ 19).

Each allege that the FDIC was making extensive examinations of the bank prior to December 21, 1974, and that knowing that the officers were telling defendant that the capital infusion would make the Bank viable, it aided the officers' fraud by failing to advise defendants that the amount of capital being infused would be insufficient.

In its briefs in support of the motions for summary judgment and in its reply briefs, the FDIC discusses each of these issues at length endeavoring to show that as to all of these issues there is no genuine issue as to any material fact.

Defendants each primarily rely upon the defenses asserted above. Defendants have each been deposed and have each submitted *ex parte* affidavits. The affidavits set forth additional facts which defendants claim create a genuine issue of fact with respect to the claim of fraud.

Summary judgment, as provided in Rule 56(c) of the Federal Rules of Civil Procedure, is only appropriate when the pleadings, affidavits and documents indicate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment. *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). When a motion for summary judgment is filed, the opposing party cannot rely upon his pleadings but must respond with affidavits or otherwise showing that a genuine issue of fact exists in the case. Rule 56(e) of the Federal Rules of Civil Procedure.

■ At the outset, it should be noted that each defendant claims that summary judgment is inappropriate in cases involving fraud. While summary judgment may be inappropriate in certain fraud cases, there are situations where it would be apropos in a case involving a defense of fraud. 8 Wright & Miller, Federal Practice & Procedure, § 2130 at 596–600 (1970). Where, for example, an essential element of fraud is unquestionably shown to be absent, summary judgment may be granted in a case involving a defense of fraud. The FDIC argues that, as to each defense raised by defendants, it has shown that no genuine issue exists.

Before reaching the legal arguments raised and the facts presented, a review of the background of this case and of defendants' situations will prove of assistance.

Each defendant has a varied business background. DeBelak is an owner of a heating, plumbing and sewer contracting concern. DeBelak has obtained financing from American for several real estate ventures. Lauterbach is the chairman of the board of Sta-Rite Corporation and has been engaged in that corporation's business since 1939. Having a college education in business and financial accounting, Lauterbach has performed financial accounting services for his corporation. Mr. Lauterbach has served on the boards of directors of two banks and three corporations. Lesselyoung, possessing a law degree, has practiced law privately, served as a state legislator, and acted as a member of the Wisconsin Public Service Commission. Currently, Lesselyoung is vice-president and general counsel of the Wisconsin Gas & Light Company.

Each defendant was an outside director of American in that they were not employed with the Bank. Lauterbach served as a director of American from prior to 1970 through 1974. Mr. DeBelak's term of service began in about 1965 and continued through 1975. DeBelak owned 2,000 shares of stock of American Bankshares Corporation, American's holding company, when he became a director. Thereafter, Mr. DeBelak made additional purchases besides the December 31, 1974 purchase which eventually led to the note in issue. The term of Mr. Lesselyoung's service as a director of American, or its predecessor, commenced in 1972 and continued through 1975. Lesselyoung also served as a director of American Bankshares. Prior to the December 31, 1974, stock sale, Mr. Lesselyoung purchased approximately 1,000 shares of Bankshares stock in the initial qualifying purchase.

Serving as directors of American during 1974, defendants received information concerning the poor financial structure of American. For example, at a meeting held on April 17, 1974, it was reported to defendants that Ernst & Ernst, American's outside auditors, advised the bank that 1973 earnings had to be reduced by $600,000.00 to bring the loss reserve up to the required amount. Creation of an additional reserve was also suggested. At the April 17, 1974 meeting it was also reported to defendants that reports from the Regional Administrator of National Banks showed loans in the total of over five million dollars as a loss, doubtful, substandard or special mention. The Regional Administrator had also advised the bank, a fact reported to defendants, that the bank's classified loan to capital ratio was on the high end of acceptable.

During May of 1974, several more meetings of the board of directors were held at which meetings defendants were informed of the serious financial problems facing the American City Bank. At a May 4, 1974 meeting defendants were informed that, due to difficulties with a series of loans known as the Bradley loans, Ernst & Ernst advised the bank to create a $3,000,000 reserve. At the May 4, 1974 meeting, defendants were also informed that the Comptrol-

ler of Currency was back to re-examine the Bradley loans. The Regional Administrator of National Banks also advised the infusion of $3,000,000. Defendants were advised that the bank examiners had already required a charge off of $929,426.00 of the Bradley loans. Among other acts, the boards of directors of American and American Bankshares authorized a plan to raise $3,000,000 in additional capital and to reduce the loans and borrowings of American. At a joint meeting of American and American Bankshares boards held on May 10, 1974, with Messrs. DeBelak and Lesselyoung in attendance but with Mr. Lauterbach absent, although minutes were kept and circulated, the problems of American were again reviewed, including the events of the three prior years. It was reported that funding for the loans was obtained. Eventually, defendants learned at a meeting held on May 15, 1974 that the $3,000,000 obtained by the sales of American Bankshares would not be passed through to American, but instead was to be retained in American Bankshares pending reduction of Bankshares' outstanding commercial paper.

Through the summer of 1974, defendants learned, by respect of their membership on the board of directors of American, that American was facing serious problems. At an August 21, 1974 American board meeting, defendants were informed that the Regional Administrator and the Deputy Comptroller of Currency had each suggested that an additional $2,000,000 in capital be raised. At the August 21, 1974 meeting defendants were provided a copy of a letter sent by representatives of the bank to the Deputy Comptroller, wherein they acknowledge the serious financial problems of American with respect to capital, loans, borrowings, and deposits. Later in August, on the 28th, a special meeting was held. DeBelak and Lesselyoung were in attendance at the special meeting; Lauterbach was not. At the August 28, 1974 meeting, for which minutes were kept and circulated, it was reported to the board that policy matters were its responsibility and not the responsibility of the Comptroller. It was

also reported that $5,000,000 in new capital was needed; the $5,000,000 included the $3,000,000 held in Bankshares plus the $2,000,000 mentioned earlier.

On September 11, 1974 federal supervisory authorities, namely the examiner who had just finished examining the bank and the Regional Administrator, met with the board of American. Defendants were in attendance. They were advised that the bank's volume of classified loans totalled 126 percent over the bank's capital. The federal authorities also informed the directors that five loans were "overlines," i. e., loans beyond the bank's legal lending limit, and that as a statutory penalty for approving the overline loans the directors would be liable for the entire amount of the loan. The need for additional capital was again noted.

During a meeting on October 16, 1974, at which DeBelak and Lesselyoung were in attendance but Lauterbach was absent, several significant facts were presented to the board of directors of American. First, the minutes of an American Bank policy meeting of October 14, 1974 were read. These minutes reflected that the bank's poor operating loss for the first nine months of 1974 were due in large part to a large number of loans that were not accruing interest. The amount of interest not recorded due to these nonaccruing loans was $140,000.00 per month. Second, during the October 16, 1974 meeting, the directors, after reviewing the opinion of counsel expressed in a letter, decided not to make a press release concerning the nine-month earnings of Bankshares. The loss for the first nine months of 1974 was projected, based on unaudited financial figures, to be $800,000. The opinion expressed by counsel indicated that the projected loss might even be larger after year-end adjustments.

On November 6, 1974, with defendants DeBelak and Lauterbach in attendance, another board meeting was held at which the board discussed a letter dated October 29, 1974 from the Regional Administrator concerning the audit ended October 21, 1974. Although Mr. Lesselyoung was not in at-

tendance at the meeting, he was sent a copy of the October 29, 1974 letter individually, as were the other directors. Among the problems outlined in the letter were the increase to 168 percent of the loan to capital ratio, the fact that the bank carried its bond account at a book value of $4,719,143 in excess of market value, and that the bank's assets and operations were deteriorating due to illegal acts and gross mismanagement resulting in undercapitalization and a very poor asset and liquidity condition. The letter noted the director's statutory liability on overline loans, including $4,493,935 in classified Bradley loans, and the bank's failure to reduce loans and borrowings as scheduled. Finally, the letter advised increasing the capital structure of the bank by: (1) passing down the $3,000,-000 from Bankshares; (2) raising an additional $2,000,000; and (3) restoring the $1,353,000 written off on the overline Bradley loans from the personal assets of the directors.

Several meetings were held towards the end of 1974 and in the early part of 1975. At a board meeting held on November 20, 1974 with DeBelak and Lauterbach present (Lesselyoung, although not present, read the minutes of the meeting), the directors learned that additional reserves had been established based upon an appraisal of the Bradley loans and the volume of classified loans, and they learned that the outside auditors advised that the 1972 and 1973 annual reports should be restated to properly reflect certain securities transactions. On December 16, 1974, Lauterbach resigned from the board and thus did not attend any additional board meetings. Lauterbach's resignation, however, was subsequent to his learning about the $2,000,000 stock sale.

During the problem period of 1974, all of the directors, including defendants, were provided with monthly statements concerning the financial condition of American. These statements indicated that the bank's capital had decreased from $11,322,027 on May 31, 1974 to $3,832,841 on November 30, 1974 and that the bank had incurred losses in excess of $127,399 in each of the months

between July and November of 1979. These financial statements were of particular interest to Lauterbach who prepared charts from the statements showing trends in American's performance.

At a meeting held on December 18, 1974, subsequent to the resignation of Lauterbach, the directors leaned of demands of the Deputy Comptroller of the Currency and the Regional Administrator that the bank receive $5,000,000 in additional capital by the end of 1974. At the meeting, the directors were reminded that they were expected to purchase Bankshares stock in order to furnish a portion of the capital. Mr. Lauterbach was advised by a letter from the bank president that, with respect to the direct liability mentioned earlier, most of the directors had concluded that they were better off purchasing the stock rather than supplying the cash to cover the overline loans.

Each defendant purchased his shares of stock on December 31, 1974. Lauterbach agreed to purchase $150,000 of Bankshares stock at $5.50, financing the purchase with a loan obtained from the American Hampton Bank, a Bankshares subsidiary. According to Lauterbach, he was told by the officers of American that they were reasonably sure the bank would survive, but he admits that his primary purpose for purchasing the securities was an attempt to avoid the overline liabilities. Lesselyoung purchased shares in Bankshares with $133,000 borrowed from the American Hampton Bank. Lesselyoung signed a note payable to American Hampton. His reasons for purchasing the stock was based upon assurances given by principal bank officers that they felt the bank would probably survive with the assistance of additional capital. DeBelak signed a note for $308,000 payable to the American Hampton Bank and used the proceeds of the loan obtained to purchase Bankshares stock at $5.50 per share. DeBelak realized he was assuming a risk, but he wanted to keep American in operation beyond the deadline so that the overline problem could be solved. In reference to claims of fraud, DeBelak asserts that unspecified information was not received

that he should have received. DeBelak also claims, among other things, that the officers stated that $5,000,000 was all that was needed to keep American open.

On April 29, 1975, each defendant borrowed money from American to pay off the American Hampton obligation. Lauterbach borrowed $154,958.34 and signed a note in that amount payable to American. Having borrowed $318,181.12 from American, DeBelak signed a note in that amount payable to American. Finally, Lesselyoung borrowed $137,396.39 from American and signed a note in that amount payable to American. The three notes payable to American City Bank, referenced above, are the subject of this action.

It is the position of the FDIC that facts in each of these cases establish that defendants did get value for their note, that the FDIC is a legitimate holder of the note, and that the affirmative defense of fraud is without legal or factual foundation. It is defendants' position, of course, that, with respect to numerous defenses, summary judgment is inappropriate. Based upon the following reasons, the Court finds that summary judgment in favor of the FDIC and against all of the defendants is appropriate in these cases.

At the outset, it should be noted that defendants are not ordinary purchasers of stock from American. By virtue of their membership on the board of directors of American, defendants stood in a unique position. They were privy to a great deal of information concerning the poor and continually deteriorating condition of the American City Bank. Defendants were on notice, by reason of this information, that American was facing severe financial problems due to, among other things, undercapitalization of the bank and numerous problem loans. Nevertheless, defendants went ahead and purchased stock in American Bankshares. Now, by these actions, defendants seek to show that the notes and underlying transactions are unenforceable.

■ Defendants allege as a defense that they did not receive value for the notes in

issue. Defendants' lack of value arguments fail to recognize what actually occurred in these cases. Defendants claim that the stock was worthless at the time of the purchase. The stock, however, was not the consideration for the notes in issue. Rather, the consideration for each of the notes in issue payable to the American City Bank were the cash distributions from American used to discharge defendants' pre-existing obligations on the notes payable to the American Hampton Bank. In any event, either cash or the discharge of a pre-existing debt is adequate consideration to support a note. *Hessman v. O'Brien,* 258 Wis. 243, 247, 45 N.W.2d 730 (1950).

Although the Court is certain that there was sufficient consideration given to support each of the notes payable to American, the close affiliation between American and American Hampton leads the Court to examine the transactions with American Hampton to see if adequate consideration existed to support the notes payable to American Hampton. The Court would note in examining the American Hampton transaction, however, that its opinion is that it need not look at the underlying transaction. The American Hampton notes are examined merely to bolster the earlier argument.

■ Assuming arguendo that defendants received stock in exchange for the notes made payable to American Hampton, the stock was adequate consideration to support a simple contract. Clearly the stock was of uncertain value and clearly its value declined to worthless in 1975. Nevertheless, at the time of the purchase on December 31, 1974, American Bankshares Corporation and American Hampton were going concerns; therefore, the stock has some value. Although the stock's value may have been less than $5.50 per share, this was adequate consideration to support a contract since "the law is not concerned with the mere inadequacy of consideration." *Home Savings Bank v. Gertenbach,* 270 Wis. 386, 395, 71 N.W.2d 347, 352 (1955). *See Federal*

*Deposit Insurance Corp. v. Hanrahan,* Case No. 76–C–594 (E.D.Wis. Jan. 8, 1979).

In light of the foregoing, the defense of lack of value is without force. Therefore, there is no genuine issue of fact on the defense of lack of value, and thus this defense does not foreclose the motion of the FDIC for summary judgment.

The second defense raised by each of defendants is that there was some error in the transaction whereby the FDIC became the holder of the notes in issue. As indicated earlier, each defendant argues that the transfer is defective on three grounds. Each ground will be discussed hereafter in the order set forth at the beginning of this memorandum and order.

■ Defendants argue that the transfer was ineffective because this Court approved the transfer *ex parte. See In re American City Bank & Trust Co., N.A.,* 402 F.Supp. 1229, 1231 (E.D.Wis.1975). Each defendant argues that, if he had been notified of the proceedings, he could have raised defects in the transfer of certain assets to the FDIC in its corporate capacity.[1] In essence, defendants' arguments are that their constitutional rights to due process were violated by the *ex parte* proceedings. This problem was discussed by another district court in the case of *In re Franklin National Bank,* 381 F.Supp. 1390, 1392 (E.D.N.Y.1974). There, the court held, relying in part upon an analogous decision by the Supreme Court in *Fahey v. Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947), "The special character of banks, and the delicate problems involved in preserving credit, justify denial of the judicial hearing which would be essential in other situations." A right to a hearing subsequent to the receivership and purchase and assumption transactions is adequate to protect defendant's right to due process. *Cf. Fahey v. Mallonee,* 322 U.S. at 253, 67 S.Ct. 1552. Therefore, this Court must conclude, again, that the *ex parte* nature of the closure of Ameri-

---

1. The defects defendants point to are that the FDIC should have assumed all and not some of the liabilities of American and that the FDIC failed to give value for the notes. These are defenses raised by defendants which will be discussed separately.

can and the surrounding transactions are constitutional procedures.[2]

Defendants argue that, by purchasing some of the assets of American, the FDIC was obligated to assume all of the liabilities. Defendants rely upon *First Empire Bank v. Federal Deposit Insurance Corp.*, 572 F.2d 1361 (9th Cir. 1978) wherein the Court held that all of the closed bank's bank obligations should have been assumed by the assuming bank for, to do otherwise, would work a preference to certain of the creditors. Whether or not the court in *Empire* was correct is not in issue here. Defendants are debtors of American, not creditors, and thus have absolutely no standing to raise this defect if in fact one exists.

Finally, with respect to the defendants' claim that there is a defect in the status of the FDIC as holder of the note because the receiver did not get value for the assets transferred to the FDIC in its corporate capacity, the uncontroverted evidence indicates that the receiver did receive value. The affidavits of Anthony Kissel, filed each case involved herein, indicate that the FDIC in its corporate capacity paid a substantial sum of money for the assets purchased. Although defendants argue to the contrary, they have not even met their burden under Rule 56(e) of the Federal Rules of Civil Procedure of presenting contrary evidence to show that no value was given by the FDIC in exchange for the note in issue and other assets purchased by it. Therefore, there is no genuine issue of material fact with respect to the defense that the status of the FDIC as holder is faulty on the basis of lack of value given. There is no genuine factual issue with respect to that simply because the facts in this case show conclusively otherwise.

The most difficult aspect of the motions for summary judgment involve the defenses of fraud raised by defendants. In their pleadings, defendants do not attack the transactions involved in the signing of the note, *i. e.,* so-called fraud in the factum, but instead defendants attack the agreements underlying the note, i. e., so-called fraud in the inducement.

In *Federal Deposit Insurance Corp. v. Rockelman,* 460 F.Supp. 999 (E.D.Wis. 1978), this Court reviewed the purposes underlying 12 U.S.C. § 1823(e) and the protections that statute affords the FDIC in its corporate capacity. This Court held that the FDIC, although not technically a holder in due course (Wis.Stat. § 403.305), is clothed with the same defenses available to a holder in due course. Since the defenses of fraud in the inducement is not available against a holder in due course under section 3–305 of the Uniform Commercial Code, (see Wis.Stat. § 403.305), this defense is also not available against the FDIC in its corporate capacity. *Rockelman,* 460 F.Supp. at 1003.

In ruling that the defenses of fraud raised by each defendant are not available against the FDIC in its corporate capacity, this Court recognizes that its interpretation of 12 U.S.C. § 1823(e) in *Rockelman, supra,* has not been reviewed by a higher court. Therefore, resolution of the FDIC's motions for summary judgment will not be decided based solely upon the ground that the fraud defenses raised in these cases are not available against the FDIC. Rather, the Court will also consider the motions on other grounds. As mentioned earlier, the difficult aspects of the FDIC's motion are the legal merits of the fraud defenses asserted herein.

There are three essential elements to a defense of fraudulent inducement—a false representation, intent to defraud, and detrimental reliance. *Goerke v. Vojvadich,*

---

2. In point of fact the Comptroller of Currency declared American insolvent and appointed a receiver all pursuant to 12 U.S.C. §§ 191 and 1821(c). This Court merely approved the purchase and assumption transaction whereby the FDIC became the holder of the notes in issue. The exigencies of the banking business required and justified the *ex parte* nature of such proceedings. Public confidence in the banking community, engendered by the protections afforded by the federal banking laws, is at the heart of the statutes permitting purchase and assumption agreements. 12 U.S.C. § 1823(e).

67 Wis.2d 102, 226 N.W.2d 211 (1975). In *McCluskey v. Thranow,* 31 Wis.2d 245, 252, 142 N.W.2d 787, 791 (1966), the court held that only a "statement of fact which is untrue" is actionable. The Wisconsin Supreme Court has held that forecasts of the future are not actionable and that opinions or judgments are not actionable statements unless the speaker is aware of present facts incompatible with the opinion or judgment. *Hartwig v. Bitter,* 29 Wis.2d 653, 139 N.W.2d 644 (1966). *See* W. Prosser, Handbook of the Law of Torts, § 109 at 720–21 (4th Ed. 1971).

■■■■ In addition to the requirement that the speaker made a false representation, there must be detrimental reliance and that reliance must be reasonable. *Keifer v. Fred Howe Motors, Inc.,* 39 Wis.2d 20, 158 N.W.2d 288 (1968). Therefore, one cannot sue for a representation that he knew to be false nor can one justifiably rely on a representation the falsity of which could have been discovered with ordinary care, especially where the party relying upon the representation possesses adequate information to create a duty of inquiry. *See Williams v. Rank & Son Buick, Inc.,* 44 Wis.2d 239, 170 N.W.2d 807 (1969); *Koehler v. Haechler,* 27 Wis.2d 275, 133 N.W.2d 730 (1965); W. Prosser, Handbook of the Law of Torts, § 108 at 715–18 (4th Ed. 1971). Professor Prosser stated in his treatise that when a party "has discovered something which should serve as a warning that he is being deceived, . . . [the party] is required to make an investigation of his own." *Prosser* § 108 at 718. The Court would note, finally, that defendants were directors of the American City Bank, albeit that they were outside directors, and as such they cannot plead ignorance of facts which they would have known in the exercise of reasonable care and diligence in their performance as directors. *Myzel v. Fields,* 386 F.2d 718, 736 (8th Cir. 1967); *Atherton v. Anderson,* 99 F.2d 883, 889 (6th Cir. 1938); *Goess v. Ehret,* 85 F.2d 109 (2d Cir. 1936). This Court would opine that a director, under his duty of performance, must be considered to be aware of financial reports and data presented to the board of directors. This is particularly so when information of the bank's financial status was presented at a board meeting at which the director was present.

Before discussing the substantive claims of fraud, the Court would note that the board minutes appended to the Kissel affidavit indicate that extensive information was presented to the board of directors of American. The information supplied to the directors and the matters discussed at the board meetings indicate the severe problems facing American. The bank was undercapitalized to the extent that, towards the end of 1974, the Regional Administrator stated in no uncertain terms that the bank must take major steps to improve its financial condition. In a letter dated October 29, 1974, which was sent to each director individually, the very severe financial condition of the bank was noted. Although the administrator advised the bank to raise additional capital as part of the cure, he also advised the bank that numerous other actions were also necessary to bring the bank to a sound financial condition. (Kissel Affid. Doc. 8139–41). In light of the information given to the directors, would any reliance upon representations made by bank officials be reasonable? The Court thinks that the claimed reliance here was clearly unreasonable.

■■■ As a first allegation of misrepresentation, defendants allege that the officers of the bank told them that the loan loss reserves were adequate. If defendants, in fact, relied upon these statements, there is absolutely no question but that the reliance was unreasonable. Such statements, if made, directly clashed with volumes of information to the contrary. In such a situation where there is such contradictory information, defendants "were required to make an investigation of [their] own." *Prosser, supra,* § 108 at 718.

The second alleged misstatement pointed to by defendants is a representation by the officers of American that the correct volume of loans had been placed in a non-accrual of interest status. If made, such a

representation was a mere opinion and as such is only actionable if the speaker knew of present facts incompatible with that opinion. *Hartwig v. Bitter, supra.* There is absolutely no evidence in the record to substantiate the claim that the bank officials representing the opinion knew it was in error. See Rule 56(e) of the Federal Rules of Civil Procedure. Clearly, proof of such inaccuracy having been known to the speaker is a difficult thing to prove, *Poller v. Columbia Broadcasting Systems, supra,* and ordinarily summary judgment would be inappropriate. These cases are, however, by no stretch of the imagination ordinary. In light of the severe problems facing the bank, the vacillations of auditors, and the constant complaints of the Regional Administrator, defendants' reliance, if any, on the statement that the correct volume of loans had been placed in the non-accrual of interest was unreasonable. As with representation concerning loan loss reserves, defendants were obligated to make an independent investigation.

The third statement that defendants allege was fraudulent was a representation by bank officials that the investment would discharge the overline liability. A direct statement to that effect would clearly have been a misrepresentation. However, in light of other statements made by the Regional Administrator, in the Court's firm opinion, defendants' reliance would have been unreasonable. The record established by defendants' own deposition testimony shows that no such representations were made. (DeBelak deposition at 82–84; Lauterbach deposition at 73; Lesselyoung deposition at 68–69). Instead, the statements were to the effect that, by keeping American alive the overline loan problem could be worked out. Clearly, such a statement, or one similar, is not a misrepresentation. Since the statements were not misrepresentations, defendants cannot base their defenses of fraud on such statements.

The fourth representation upon which defendants rely is an alleged statement by the bank officials that the infusion of capital would make the bank viable. A statement that the bank would be viable with the infusion of additional capital was nothing more than a prediction. As indicated earlier, if the speaker knew the statement was in error even a mere prediction can constitute a misrepresentation. *Hartwig v. Bitter, supra.* Here defendants had a tremendous amount of information and could have made their own inquiries concerning whether the infusion of capital would make the bank viable. The materials made available to defendants, including letters from the Regional Administrator, indicate that American had to take corrective measures in addition to raising more capital. In such a situation where defendants had information from which to conduct an independent investigation and they knew or should have known that the bank faced many problems only one of which was undercapitalization, defendants could not have justifiably relied on a statement that the infusion of capital through their and others stock purchases would make American viable.

Defendants have alleged that the FDIC participated in the alleged fraud practiced by the bank officers. Specifically, defendants allege that the FDIC knew that the bank officers were telling defendants that the capital infusion would be sufficient to make the bank viable and because of that knowledge had a duty to advise defendants that the capital infused in itself would not be sufficient to make American viable. As discussed earlier, the bank officers did not tell defendants that the infusion of capital would make the bank viable. Therefore, the FDIC had no duty to tell the defendants that the infusion of capital in and of itself would not make the bank viable, particularly since the letters from the Regional Administrator and the Comptroller point out numerous problems that had to be solved.

In responding to the motion for summary judgment, defendants have each appended an affidavit to their responsive brief in an attempt to raise a factual issue on the claim of fraud. Defendants point to three factual circumstances which they assert were concealed from them and if disclosed would have caused them to refrain from purchasing the American Bankshares stock on De-

cember 31, 1974. First, defendants point to criminal overtrading by bank officers, Harold L. Erickson and Francis L. Wilson, which overtrading allegedly caused the books of American and American Bankshares to be inaccurate. Although in late 1974, defendants did not know whether the overtrading was illegal conduct, the minutes of the board indicate that the inaccuracy of the bank valuation was noted to the directors. While Lesselyoung read the minutes of the November 20, 1974 board meeting (Lesselyoung deposition at 48), DeBelak and Lauterbach were actually present. (Document No. 8145–46 appended to the Kissel Affid.) Furthermore, the record indicates that each defendant was supplied with a copy of a letter from Arthur Anderson & Company dated December 11, 1974, wherein the accounting firm noted inaccuracies in the 1972 and 1973 financial reports because of the overtrades. In light of these disclosures, the inaccuracies caused by the overtrades was known to defendants.

The second claim made by defendants in their affidavits is that Raymond Callen, the president of American, criminally misappropriated bank funds during 1974 by creating a compensating balance in the amount of about $1,500,000 at the Colonial Bank & Trust Co. in Illinois. Defendants claim that they were not aware of Callen's conduct at the time of their stock purchase. First, defendants do not point to how this criminal conduct caused any inaccuracies in the accounts of American. Second, and most important, the minutes of the board of directors of American indicate that defendants were advised of the deposits in the Illinois bank (Documents numbers 7952–55; 7959 appended to Kissel Affidavit) and that defendants approved of the deposits in the Colonial Bank & Trust Company. (Document No. 7992 appended to Kissel Affidavit). Since the facts were disclosed to the board of directors, defendants cannot rely on this in support of a claim of fraud.

The final new fact that defendants claim creates a genuine issue of fact involves the estimated loss of $800,000 for the first nine months of 1974 which turned out to be $4,000,000. First, the affidavits are woefully inadequate in terms of specifics as to who made the alleged misrepresentation and when. In the Court's opinion, the requirements of Rule 56(e) of the Federal Rules of Civil Procedure have not even been met. Furthermore, the minutes of a board meeting held October 16, 1974, at which Lauterbach was absent but the other two defendants were present, indicate that the $800,000 figure was a mere estimate that might require revision which could result in even a greater loss. (Document No. 8116, 8131–32 appended to Kissel Affidavit). The directors even voted against a press release because of the inaccuracy. In light of the foregoing, defendants' use of the $800,000 projected loss figure to create a genuine issue of fact on the fraud claim, in the Court's opinion, does not create such an issue.

In light of the foregoing, the Court finds that there is no factual support in the record for the fraud claims and that there is no genuine issue as to any material fact with respect to the fraud claims on both factual and legal grounds.

Before concluding consideration of the FDIC's motions for summary judgment, the Court would note that the FDIC has raised other defenses. Since the Court can resolve these cases on other grounds, it will decline to consider the issues raised.

In light of the foregoing memorandum of law, and having considered the briefs and materials submitted by the parties in these actions, the Court finds that the FDIC is entitled to summary judgment in the actions it has brought to collect on the notes in suit. Therefore, the motions of the FDIC for summary judgment action under consideration in this memorandum must be and hereby is granted. Attorneys for the FDIC are hereby ordered to supply proposed judgment forms in each of the cases.