**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff-Appellee,**

v.

**Henry S. LAUTERBACH, John Debelak and Nicholas Lesselyoung, Defendants-Appellants.**

Nos. 79–2286 to 79–2288.

United States Court of Appeals, Seventh Circuit.

Argued April 28, 1980.

Decided July 17, 1980.

Rehearing Denied Aug. 14, 1980.

Rehearing En Banc Denied Sept. 15, 1980.

Matthew J. Flynn, Quarles & Brady, Milwaukee, Wis., for defendants-appellants.

Gregory G. Wille and John W. Hein, Gibbs, Roper, Loots & Williams, Milwaukee, Wis., for plaintiff-appellee.

Before PELL and SPRECHER, Circuit Judges, and MARKEY, Chief Judge.*

SPRECHER, Circuit Judge.

This is an appeal from the district court's granting of summary judgment in favor of plaintiff, Federal Deposit Insurance Corporation (FDIC).[1] The defendants contend that the district court erred in its interpretation of the relevant statute, 12 U.S.C. § 1823(e), and that genuine issues of material fact precluded summary judgment. We find defendants' arguments without merit and affirm the judgment below.

## I

### A

In these actions, the FDIC seeks payment of principal and accrued interest on three promissory notes.[2] Each of the notes is payable to the American City Bank & Trust Company (American) and all were due on April 28, 1976. Each defendant admits executing a note and admits that no payments of principal or interest have been made.[3]

---

*Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, is sitting by designation.

1. The district court's opinion is reported as *Federal Deposit Insurance Corp. v. Lesselyoung,* 476 F.Supp. 938 (E.D.Wis.1979).

2. The FDIC filed three separate lawsuits in the court below, each seeking payment of one of the notes. The suits were not consolidated. The FDIC's summary judgment motions in the three suits were considered together by the district court because the defendants raised the same defenses and were similarly related to the payee on the notes. In addition, the same attorney represented all three defendants in the court below and the pleadings and briefs in the three suits were substantially identical. 476 F.Supp. at 940. The defendants are in a similar posture in this appeal. Although the appeal has been handled as a single case, we will note differences between the defendants where relevant in our consideration of the issues.

3. John DeBelak executed a note in the principal amount of $318,181.12. Henry Lauterbach executed a note in the principal amount of $154,-958.34. Nicholas Lesselyoung executed a note in the principal amount of $137,396.39. Copies of the promissory notes are attached to the complaints in the respective suits.

■ By order of the Comptroller of the Currency, American was declared insolvent on October 21, 1975, and the FDIC was appointed its receiver. The FDIC, as receiver, entered into a purchase and assumption agreement with the Marine National Exchange Bank of Milwaukee. In order to facilitate this agreement, the FDIC, in its corporate capacity, purchased from the FDIC, in its capacity as receiver, certain assets of American, including the three notes at issue here.[4] The purchase and assumption agreement was approved by the district court in an *ex parte* proceeding. See *In re Liquidation of American City Bank & Trust Co., N.A.*, 402 F.Supp. 1229 (E.D.Wis.1975).

In the district court, the defendants raised essentially three defenses to the FDIC's claims. First, each defendant denied receiving value for his note. Second, each defendant challenged the validity of the purchase and assumption transaction and the effectiveness of the transfer of the notes to the FDIC.[5] Finally, each defendant asserted that execution of his note was induced by fraud committed by American and the FDIC in connection with a 1974 stock purchase. Each defendant had purchased stock of American Bankshares Corporation (Bankshares), the parent of American, in 1974; the purchases were financed through loans from an affiliated bank subsequently repaid with the proceeds of the notes at issue here. The defendants asserted that they were fraudulently induced to purchase this stock by misrepresentations on the part of American's officers. The FDIC allegedly aided this fraud by failing to advise the defendants that the assurances given them by the officers were misrepresentations.

The FDIC moved for summary judgment in each of the three suits. The defendants opposed the motions and filed identical affidavits alleging additional instances of fraud on the part of the Bank's officers. The district court granted summary judgment in favor of the FDIC in all three suits, finding that none of the defenses raised by the defendants presented a genuine issue of material fact. With respect to the fraud defense, which is our primary concern on this appeal, the district court found for the FDIC on two alternate theories. First, the court held that 12 U.S.C. § 1823(e) clothed the FDIC, in this situation, with the same protection from the defense of fraud in the inducement accorded a holder in due course of a negotiable instrument.[6] See Wis.Stat. § 403.305. In the alternative, the district found that even if the fraud defense could be asserted against the FDIC, the pleadings, affidavits, depositions and other materials in the record did not reveal a genuine issue of material fact with respect to that defense. The district court also ruled that no genuine issue of material fact existed with respect to whether defendants had received value for their notes and found no defect in the purchase and assumption transaction or the transfer of the notes to the FDIC.

4. It is clear that the FDIC may act in two separate capacities and may thereby deal with itself when it is serving as receiver of a closed bank. See *F.D.I.C. v. Citizens Bank & Trust Co.*, 592 F.2d 364, 366 (7th Cir.), *cert. denied*, 444 U.S. 29, 100 S.Ct. 56, 62 L.Ed.2d 37 (1979); *First Empire Bank v. F.D.I.C.*, 572 F.2d 1361, 1364 (9th Cir.), *cert. denied*, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978).

5. This defense consisted of several distinct elements, described by the district court as follows:

Each defendant asserts that the transfer of the note to the FDIC was ineffective by reason of

(a) it being approved by this Court *ex parte*,
(b) the failure of the FDIC to assume liabilities of American City Bank, and

(c) the alleged failure of the Receiver to receive value for the transfer.
476 F.Supp. at 940–41.

6. The district court has consistently interpreted 12 U.S.C. § 1823(e) in this manner in a series of cases arising out of the insolvency of the American City Bank. See *F. D. I. C. v. Rockelman*, 460 F.Supp. 999, 1002–03 (E.D.Wis.1978); *F. D. I. C. v. Rosenthal*, 477 F.Supp. 1223, 1226–27 (E.D.Wis.1979); *F. D. I. C. v. Balistreri*, 470 F.Supp. 752, 756 (E.D.Wis.1979); *F. D. I. C. v. Hanrahan*, No. 76–C–594 (E.D.Wis. Jan. 8, 1979). See also *F. D. I. C. v. James T. Barry Co.*, 453 F.Supp. 81, 83 (E.D.Wis.1978). This interpretation has not yet been reviewed by this court.

On this appeal, the issues have been narrowed somewhat. In the district court, the defendants raised the alleged defects in the purchase and assumption transaction and the transfer of the notes to the FDIC as a separate defense, independent of the fraud allegations. On appeal, however, the defendants raise this defense only in connection with their argument that the defense of fraud in the inducement maybe asserted against the FDIC. See Brief of Defendants-Appellants at 15–21, 37–38. Because we find that defendants' allegations of fraud present no genuine issues of material fact, we need not decide whether the FDIC is protected from this defense. We therefore will not address the challenges to the purchase and assumption transaction or the transfer of the notes. The issues are further narrowed because the defendants do not contend on appeal that the FDIC was involved in the alleged fraud. Finally, although they continue to assert that they received no value for their notes, it is apparent that they consider this defense substantially equivalent to the fraud defense. See Brief of Defendants-Appellants at 35–37.

### B

A description of the circumstances underlying the stock purchases and loan transactions at issue here is necessarily complicated but nonetheless essential to an understanding of the defendants' allegations of fraud. These underlying facts are essentially undisputed and are set out below substantially as recited by the district court.

American City Bank & Trust was a national banking association in Milwaukee, Wisconsin. One hundred percent of the capital stock of American was owned by American Bankshares, a holding company for American and several other banks. The defendants were all nonemployee directors of American and two, Henry Lauterbach and Nicholas Lesselyoung, were also directors of Bankshares.[7] The defendants had served as directors of American for varying terms: Mr. DeBelak served from approximately 1965 to 1975, Mr. Lauterbach served from approximately 1970 through 1974, and Mr. Lesselyoung served from 1972 through 1975. The depositions reveal that, in addition to their service on American's board, the defendants all possess a wide variety of business and financial experience.

During 1974, the defendants, as directors of American, received a large volume of information concerning the poor and continually deteriorating financial condition of the Bank.[8] At a regular directors meeting on April 17, 1974, the directors were informed that the Regional Administrator of National Banks had classified over $5.9 million of American's loans as loss, doubtful, substandard or special mention. The Bank's classified loan to capital ratio of 40% was considered on the high end of acceptable. In addition, American's outside auditors had informed American that 1973 earnings must be adjusted downward by $600,000 in order to increase the loan loss reserve. The auditors also recommended creation of an additional reserve of $1 to $3 million in connection with a particular group of loans, the Bradley loans.

The Bradley loans were a topic of discussion at a May 4, 1974, joint meeting of the Bankshares and American boards. The directors were advised that the outside audi-

---

**7.** The district court's opinion mentions only Mr. Lesselyoung as a director of both Bankshares and American. 476 F.Supp. at 942. Mr. Lauterbach's deposition testimony indicates, however, that he also was a director of Bankshares. See Lauterbach Deposition at 6–7.

**8.** Much of the information presented to the directors was made part of the record in this case by attachment of the minutes of the directors' meetings to the affidavit of Anthony Kissel, an FDIC assistant liquidator involved in the liquidation of American. Throughout their argument in this court, defendants suggest that this method of introducing the minutes was somehow improper, although they have never contended that the minutes are not genuine. It is clear, however, that documents and exhibits identified by affidavit may be submitted to support a motion for summary judgment. See *First National Bank Co. v. Insurance Company of North America*, 606 F.2d 760, 766 (7th Cir. 1979). At any rate, our examination of the record reveals that defendants did not object to this evidence in the court below; we will not entertain such an objection for the first time on appeal.

tors had required creation of a $3 million reserve for possible losses on these loans. The auditors had contacted the Comptroller to suggest further review and consideration of the recent report of examination of American. A reexamination was in progress with respect to Bankshares operations in general and the Bradley loans in particular; the examiners had already required an immediate charge off of $929,426 on those loans. In addition, the Regional Administrator had advised the Bank that $3 million in additional capital would be required. American's board authorized acquisition of the additional capital within seven business days and directed the officers to take action to reduce loans and borrowings. This action was confirmed by a letter to the Regional Administrator acknowledging American's liquidity, loan and capitalization problems.

The two boards again met jointly on May 10, 1974. According to the minutes, a comprehensive history of the events of the preceding three years which had led to the present situation was delivered. The plan for acquisition of additional capital was discussed in detail. It was expected that Bankshares stock would be sold at $20 per share, with the proceeds used to purchase stock in American. Funding for this transaction had been arranged with another bank. At the regular board meeting on May 15, 1974, American's directors were informed that the proceeds of the sale of Bankshares stock would not immediately be infused into American but would be retained by Bankshares until its outstanding commercial paper had been reduced.

At its regular monthly meeting on June 19, 1974, American's board was informed that a letter had been received from the Regional Administrator regarding the Bank's loan and borrowing reduction program. The minutes of a joint meeting of the Executive Committee of Bankshares and the Policy Committee of American, appended to the minutes of the directors meeting, indicate that the letter concerned American's failure to reduce borrowings as earlier agreed. The letter informed American that new loans should be limited and that a program for month-by-month reduc-

tion in loans and borrowings should be submitted.

American's board was informed on August 21, 1974, that the Regional Administrator and Deputy Comptroller had directed that another $2 million in new capital, in addition to the initial $3 million, be infused into the Bank. The directors were provided with copies of a letter sent by counsel for American to the Comptroller acknowledging the serious financial problems confronting the Bank with respect to capital, loans, borrowings and deposits, and agreeing to follow the Comptroller's recommendations. One week later, on August 28, 1974, the directors convened again, this time at a special meeting called at the request of the Regional Administrator. The directors were informed by the Regional Administrator's representative that American's activities were being closely examined by the Regional Administrator and the Comptroller and that three basic problems had been identified: liquidity, asset quality and condition, and capital adequacy. The board was told that the Bank needed $5 million in new capital—the original $3 million still retained by Bankshares and the $2 million mentioned on August 21. It was emphasized that policy matters were the responsibility of the board and not that of the Comptroller.

Representatives of federal regulatory agencies were again present at the board's September 11, 1974 meeting. The Regional Administrator and National Bank Examiner informed the directors that the classified loan to capital ratio, which at 40% had been at the high end of acceptable, had reached 126%, and that 14.2% of American's loans were past due. The directors were also informed that five loans were overlines, loans in excess of American's legal lending limit, and that bank directors are personally liable for the entire amount of such overline loans. The importance of new capital was once more emphasized.

The minutes of the October 14, 1974, joint meeting of Bankshares' Executive Committee and American's Policy Committee were attached to the minutes of the directors'

regular meeting on October 16, 1974. The committees had discussed the overline loan situation and American's need for new capital. The Bank's poor operating results were noted and were attributed primarily to losses on securities transactions and to a large number of loans which were not accruing interest. Bankshares' board had been notified that the net loss for the first nine months of 1974 was estimated to be $800,000. The directors were informed, however, that in the view of Bankshares' counsel this estimate should not be released. It was feared that the estimate could prove to be misleading because year-end adjustments could result in a much larger actual loss.

At a special meeting on November 6, 1974, the board discussed an October 29 letter from the Regional Administrator, a copy of which was sent to every director, outlining in detail the deteriorating condition of the Bank. The classified loan to capital ratio had risen to 168%, a figure characterized as "extremely disproportionate." Over 14% of American's loan portfolio was delinquent. The Regional Administrator's examination had uncovered very serious violations of law involving the Bradley overline loans and had revealed that the Bank's bond account was carried at a book value $4.7 million in excess of its market value. In the Regional Administrator's view, the Bank was in an unsafe liquidity condition and was suffering from a very rapid and extremely serious deterioration in its assets and operations due to illegal acts and gross mismanagement. American was in an unsound and extremely extended condition, suffering from a volatile deposit structure and a loan portfolio in very poor condition. American had repeatedly failed to reduce loans and borrowings as promised and still had not received the $3 million in new capital raised in the May 1974 stock sale. The Regional Administrator directed

infusion of this amount into the Bank, acquisition of an additional $2 million, and restoration from the directors' personal assets of $1,350,000 written off on the Bradley overline loans. The directors were reminded of their potential personal liability on overline loans.

The directors continued to receive such bleak financial information during the remainder of 1974. At the November 20, 1974, regular board meeting, the directors were informed that $3.6 million had been set aside as an additional loan loss reserve and that American's new outside auditors recommended adjustment of 1972 and 1973 financial figures to reflect values and transactions in trading account securities. On December 18, 1974, the directors met again and were reminded of the urgent need for new capital. The Regional Administrator required that the new capital be on American's books by the end of 1974 and that no new loans be made until the new capital had been received. The directors were informed that they were expected to contribute some of the required capital through stock purchases. Also at this meeting, the resignation of Mr. Lauterbach was announced.[9]

The defendants purchased Bankshares stock on December 31, 1974, at a price of $5.50 per share.[10] Each defendant financed the purchase in total through a loan from American Hampton Bank, a Bankshares subsidiary. On April 29, 1975, the notes at issue in this case were executed, with the proceeds being used to pay off the principal and accrued interest on the Hampton loans. Defendants now seek to avoid payment of these notes by charging, among other things, that they were fraudulently induced to enter into the December 1974 stock purchase by misrepresentations on the part of American's officers.

**9.** American's monthly financial statements, provided to the directors throughout the period in question, numerically substantiated the verbal reports outlined in the text. American's capital had decreased from $11,322,027 on May 31, 1974 to $3,832,841 on November 30, 1974. The Bank incurred losses in excess of $125,000 per month for every month between July and November of 1974. See 476 F.Supp. at 943–44.

**10.** At the time of this transaction, Mr. Lauterbach had already resigned as a director of American. He nonetheless participated in the stock purchase in the same manner as DeBelak and Lesselyoung.

## II

### A

■ Under Wisconsin law, three elements must be established by a party alleging fraudulent misrepresentation:

First, there must be a false representation; second, it must be made with intent to defraud and for the purpose of inducing another to act upon it; and third, such other person must rely on it and be induced to act, to his injury or damage.

*Goerke v. Vojvodich*, 67 Wis.2d 102, 226 N.W.2d 211, 214 (1975). See also *McCluskey v. Thranow*, 31 Wis.2d 245, 142 N.W.2d 787, 791 (1966). In general, the false representation must relate to present or pre-existing events or facts and may not be merely a prediction of future events or an unfulfilled promise. See *Hartwig v. Bitter*, 29 Wis.2d 653, 139 N.W.2d 644, 646 (1966). A promise may be actionable where the promisor has a present intent not to perform and a prediction may constitute fraud where the predictor is aware of present facts incompatible with the prediction or opinion. *Id.* at 647.

■ The party alleging fraud must have relied upon the false representation to his detriment and his reliance must have been justifiable. See *Kiefer v. Fred Howe Motors, Inc.*, 39 Wis.2d 20, 158 N.W.2d 288, 292 (1968). Reliance on obviously false statements is not justifiable, neither is reliance upon statements the falsity of which could have been discovered through the exercise of ordinary care. See *Williams v. Rank & Son Buick, Inc.*, 44 Wis.2d 239, 170 N.W.2d 807, 810–11 (1969). Where a party possesses information which indicates or suggests that a representation made to him is false, there is a duty to take affirmative steps to investigate that representation.

See *Kiefer, supra*, 158 N.W.2d at 293; *Koehler v. Haechler*, 27 Wis.2d 275, 133 N.W.2d 730, 731–32 (1965); W. Prosser, *Handbook of the Law of Torts* § 108, at 715–18 (4th ed. 1971). A party presented with an opportunity to learn the truth may not ignore that opportunity and blindly rely upon another's representations where ordinary care would have revealed the truth. See *Williams, supra*, 170 N.W.2d at 811.

■ Whether the exercise of ordinary care would have revealed the truth "is to be determined in light of the intelligence and experience of the misled individual." *Id.* at 810–11. The defendants' status as directors of American is thus of substantial importance in this case. A corporate director may not claim total ignorance of the corporation's affairs, particularly those matters fairly disclosed by the directors' meetings and those corporate records to which directors had access. See *Myzel v. Fields*, 386 F.2d 718, 736 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *Goess v. Ehret*, 85 F.2d 109, 110 (2d Cir. 1936). See also *Koehler, supra*, 133 N.W.2d at 731–32. This is not to say that a director may not plead and prove fraud against his own corporation and its officers, but rather that a director's access to corporate information and his duty to maintain some minimal degree of familiarity with corporate affairs are factors which must be considered in determining whether reliance on a representation was justifiable.[11]

■ As defendants properly note, resolution by summary judgment of the issues raised by an allegation of fraud is often difficult or impossible. There is not, however, as defendants seem to suggest, a firm rule precluding use of the summary

**11.** The district court attached great significance to defendants' status as directors of American. The district court characterized the position of the defendants in this case as follows:

[I]t should be noted that defendants are not ordinary purchasers of stock from American. By virtue of their membership on the board of directors of American, defendants stood in a unique position. They were privy to a great deal of information concerning the poor and continually deteriorating condition of the American City Bank. Defendants were on notice by reason of this information, that American was facing severe financial problems due to, among other things, undercapitalization of the bank and numerous problem loans. Nevertheless, defendants went ahead and purchased stock in American Bankshares. Now, by these actions, defendants seek to show that the notes and underlying transactions are unenforceable.

476 F.Supp. at 944.

judgment procedure in cases involving questions of fraud.[12] As Professor Moore states:

> [I]n whatever guise the issue of fraud may appear in an action, the general basic principles underlying summary judgment apply and, if these are met, the issue of fraud may be summarily adjudicated.

6 *Moore's Federal Practice* ¶ 56.17[27], at p. 56–866 [footnote omitted]. In our recent decision in *First National Bank Co. v. Insurance Company of North America*, 606 F.2d 760 (7th Cir. 1979), we approved a district court's granting of partial summary judgment resolving issues of fraud. We noted that although a district court is not to try issues of fact in a summary judgment proceeding, it has the power to penetrate the pleadings and look at any evidentiary source to determine whether summary adjudication is appropriate. *Id.* at 767. A genuine issue of fact is raised where the facts alleged would constitute a legal defense if proven. *Id.* at 766. Once a showing has been made by the movant, the burden rests upon the opposing party to show that "he has a ground of defense fairly arguable, and of a substantial character." *Id.* at 767. In this case, the FDIC made the initial showing by presentation of the notes, the execution and nonpayment of which were admitted; the burden then shifted to defendants to allege facts which, if proven, would establish as of a substantial character their defenses of fraud and lack of consideration. We turn to defendants' allegations of fraud to determine whether they raised genuine issues of material fact precluding summary judgment.

**B**

Defendants' fraud allegations fall into two categories: those presented in defendants' answers in the court below and those first mentioned in the affidavits filed by defendants in response to the FDIC's motions for summary judgment. We will consider each category in turn.

**1**

■ In their answers, defendants alleged four instances of misrepresentation by American's officers. The district court carefully and extensively analyzed each of the pleaded allegations and found that none presented a genuine issue of material fact precluding summary judgment. 476 F.Supp. at 947–48.[13] In their initial brief in this court, the defendants did not discuss those allegations at all, focusing instead upon the allegations presented in their affidavits. A fair reading of their brief reveals no argument that the district court erred in its decision with respect to the pleaded allegations. In their reply brief, the defend-

---

12. Defendants' argument, however, is not wholly without merit in that it is based upon a recognition that certain kinds of issues can often only be resolved by a full trial. In a case in which the party moving for summary judgment urges that fraud be found, summary judgment will often be inappropriate because the district court would be required to resolve the subjective issue of fraudulent intent. However, in a case in which the movant argues that an allegation of fraud be rejected, such as the instant case, summary judgment is more likely to be feasible because the movant's position can be established if any one of the necessary elements is shown to be without support in the record. The district court in such a proceeding will not necessarily be required to address the question of intent.

13. The district court found that reliance on a statement that American's loan loss reserves were adequate was clearly unreasonable in light of "volumes of information to the contrary" requiring defendants to investigate the situation. Reliance on a statement that the correct volume of loans had been placed in non-accrual of interest status was unreasonable because the statement was a mere opinion. Even if the speaker knew of facts incompatible with his opinion, reliance upon it was unreasonable because defendants were in possession of enough information to alert them to the need for independent investigation. The third alleged misrepresentation, that defendants' overline liability would be discharged by the stock purchase, was never actually made, as revealed by defendants' depositions. The final alleged misrepresentation was a statement that the infusion of new capital would make the Bank viable. This was a mere prediction; furthermore, the directors had been informed on several occasions that undercapitalization was only one of American's problems and that other corrective measures were necessary. The defendants were chargeable with knowledge of sufficient contrary information to require independent investigation. 476 F.Supp. at 947–48.

ants, in response to the FDIC's observation that the pleaded allegations had apparently been abandoned, asserted that this was not the case. See Reply Brief at 6–7. Despite this assertion, defendants did not explain to this court in what way the district court erred in its treatment of these allegations. They claim, in general terms, that the pleaded allegations presented genuine issues of fact requiring a trial, but avoid any detailed consideration of the district court's ruling.

We have, nonetheless, given extensive consideration to the pleaded allegations and find the district court's conclusion correct. Examination of the record in this case indicates that these allegations raised no genuine issues of material fact; they would not constitute a legal defense if proven and did not reveal "a ground of defense fairly arguable, and of a substantial character." *First National, supra,* 606 F.2d at 767. We therefore affirm the district court's decision with respect to defendants' pleaded allegations of fraud.

2

■ Three instances of fraudulent conduct were alleged in the affidavits filed by the defendants in response to the FDIC's motions for summary judgment:

[C]ertain officers of American City Bank & Trust Company and American Bankshares Corporation . . . had, during the years 1972 and 1973, engaged in illegal and fraudulent conduct with respect to the bond portfolio of American City Bank & Trust Company, by engaging in transactions known as "overtrades", which had the effect of failing to reflect on the books and records of account of the Bank and of American Bankshares Corporation losses on bond transactions, which had the effect of concealing the

true financial condition and income statements of these corporations.

\*     \*     \*     \*     \*     \*

[S]ometime during the year 1974 Raymond L. Callen, President of American City Bank & Trust Company, misappropriated Bank funds by creating a compensating balance in the amount of approximately $1,500,000 at Colonial Bank & Trust Company, Chicago, Illinois. .   .

\*     \*     \*     \*     \*     \*

[O]n December 31, 1974, the net loss of American City Bank & Trust Company for the nine month period ending September 30, 1974, as had been represented to [defendants], was approximately $800,000, whereas in truth and in fact such loss for the nine month period ending September 30, 1974, was in excess of $4,000,000  .   .   . .

\*     \*     \*     \*     \*     \*

Lesselyoung Affidavit, ¶¶ 3–5, Appendix at 126–28.[14] The district court found no factual support in the record for these claims and ruled that they raised no genuine issues of material fact. 476 F.Supp. at 948–49. For the reasons stated below, we agree with this conclusion.

Defendants' first allegation points to alleged overtrading by American's chairman and vice-president, causing inaccuracies in American's books.[15] The record reveals that the Bank's directors were informed of inaccuracies in the Bank's valuation of its bonds and of the overtrade transactions. The October 29, 1974, letter from the Regional Administrator to the board, copies of which were sent to all directors, stated that American's bond account was carried at a book value $4,719,143 in excess of market

**14.** Identical allegations are contained in the affidavits of DeBelak and Lauterbach.

**15.** Defendants describe "overtrading" as follows:

Essentially, an "overtrade" in securities occurs when securities are sold at a price above their fair market value. For example, if American City owned a State of Wisconsin bond, with a fair market value of $100,000, while for instance, a bond trader in Chicago

owned an Illinois bond with a fair market value of $100,000, the two might agree to sell each other their respective bonds for $120,000 each. Such a transaction would permit each party to reflect the profit or loss on the sale at a price $20,000 more favorable than it really was, *and* to upgrade the "book" value of its retained investment security to $120,000.

Brief of Defendants-Appellants at 23 [emphasis in original].

value and indicated that this inaccuracy was due, at least in part, to "illegal acts and gross mismanagement. . . ." Kissel Affidavit, Exhibit G, at 08139.[16] The minutes of the November 20, 1974, board meeting indicate that the directors were informed that American's new outside auditors recommended adjustment of 1972 and 1973 annual report figures to reflect values and transactions in trading account securities. *Id.* at 08146.[17] This matter was also discussed at the board's December 18, 1974 meeting. *Id.* at 08165. Finally, each defendant, at the time of the December 1974 stock purchase, received a copy of a December 11, 1974, letter from the outside auditors to the Bank which described the overtrade transactions and explained the inaccuracies in the Bank's records caused by them.[18] Supplemental Appendix at 242–44. Thus, prior to the stock purchases, the defendants had received information revealing inaccuracies in American's books and, at the time of the transaction, they were informed of inaccuracies and of the transactions which caused them. No claim of fraud may be maintained where the defendants were in possession of information revealing the inaccuracies which allegedly misled them.

The second allegation of fraud pertains to misappropriation of funds by American's president through creation of a $1.5 million compensating balance at Colonial Bank & Trust Company. Although the minutes of the directors' meetings do not reveal specific discussion of the compensating balance, they do reveal discussion of Colonial's role

in financing the May 1974 sale of Bankshares stock. Minutes at 07952–53, 07959. They further reveal that Colonial extracted a number of concessions from American in exchange for its financing the May 1974 transaction.[19] It is also clear from the minutes that the directors were informed that American had some form of deposit with Colonial. *Id.* at 07992. The directors, therefore, while perhaps not specifically informed of the details of the compensating balance, were nonetheless aware of an ongoing relationship between American and Colonial. More important, even accepting defendants' argument that the information in their possession was insufficient to create a duty to investigate, the affidavits still do not allege an actionable misrepresentation. Although the affidavits assert that defendants would not have purchased the stock had they known of the compensating balance, it is nowhere explained how this conduct caused any inaccuracies in the books of the Bank on which they relied to their detriment. While the district court, in a summary judgment proceeding, is required to draw all permissible inferences in favor of the party opposing summary judgment, it is not required to speculate, in the absence of any evidentiary support, as to the possible factual connection between an alleged instance of fraudulent conduct and the transaction said to have been induced by it. The district court properly disposed of this allegation.

Defendants' final allegation is that the board was informed that American's esti-

16. The letter, from Donald B. Smith, the Regional Administrator, states, in part:

  The bank's bond account is carried at a book value $4,719,143 in excess of present market value. These conditions indicate the very rapid and extremely serious deterioration that has occurred in the bank's assets and internal operation because of illegal acts and gross mismanagement. . . .

  Kissel Affidavit, Exhibit G, at 08139 (hereinafter cited as Minutes at ____).

17. Mr. Lesselyoung did not attend this meeting, but did read the minutes. Lesselyoung Deposition at 48.

18. Defendants assert that there is no showing in the record that they read the letter or had time to read it or that it made adequate disclo-

sure. Reply Brief at 12. The district court stated, however, that each defendant was supplied with a copy of the letter, 476 F.Supp. at 949, a fact the defendants do not deny.

19. The minutes reveal that Colonial required, among other things, that certain individuals be elected to American's board, that Colonial's president be invited to attend Policy Committee meetings, that certain individuals be named to Bankshares' Board, and that Mr. Raymond Callen be named president of American. Minutes at 07953. Apparently, the compensating balance was a further condition of the loan. See Brief of Defendants-Appellants at 28, quoting Count 3 of the indictment against Callen.

mated net loss for the first nine months of 1974 was $800,000, when in fact the actual loss for this period was in excess of $4 million. The $800,000 estimate was presented to the directors at an October 16, 1974 board meeting. As discussed in Part I, B, *supra*, the directors were advised at that time that $800,000 was merely an estimate and were counseled against releasing the figure because it could prove to be "extremely misleading" in that year-end adjustments could produce "a much larger loss." Minutes at 08132. The directors informally decided not to publish the estimated loss figure. *Id.* at 08116. This estimate simply will not support a claim of fraud where the probable inaccuracy of the figure was emphasized at the time it was presented to the board.[20]

The essence of defendants' argument in this case is that while they do not deny that they were aware that American was in serious financial difficulty, they did not know that its officers had engaged in fraudulent and illegal conduct. American's directors were, however, informed prior to the December 1974 stock purchases that such conduct had occurred. The board was informed by federal officials on September 11, 1974, that overline loans had been made in violation of law, for which the directors might ultimately be liable. This problem was a frequent topic of discussion at board meetings thereafter. The Regional Administrator's October 29, 1974 letter stated that a bank examiner's report set out "very serious violations of law" and that the Bank's rapid deterioration was due to "illegal acts and gross mismanagement." Minutes at 08139. After such reports from federal officials involved in scrutinizing the operations of the Bank, the directors knew or should have known not only that American had financial problems, but also that these

problems were traceable, at least in part, to serious misconduct by American's officers.

The fraud allegations in defendants' affidavits are unsupported by the record and failed to create a genuine issue of material fact in this case. We therefore affirm the district court's decision with respect to these allegations.

### III

In addition to their allegations of fraud, defendants claim that their notes are not enforceable against them due to lack of consideration. They appear to regard this defense as merely a rephrasing of their fraud defense.[21] To the extent that this is the case, the defense has been disposed of in Part II, *supra*. To the extent that defendants intend lack of consideration to be an independent defense, we agree with the district court's disposition of the issue, for the reasons discussed below.

The notes at issue in this case were given to American in exchange for American's payment of defendants' pre-existing obligations on the Hampton loans. Discharge of a pre-existing debt is adequate consideration under Wisconsin law to support execution of a note. See *Hessman v. O'Brien*, 258 Wis. 243, 45 N.W.2d 730, 732–33 (1951). To avoid this result, defendants attempt to consolidate three separate transactions—the Hampton loan, the purchase of stock, and the American loan—into a single transaction by arguing that the real consideration for the notes given to American in April 1975 was the stock purchase from Bankshares in December 1974 and that the stock was worthless. Accepting, for the sake of argument, defendants' view of the transactions, it is nonetheless clear that defendants received consideration for both the Hampton and American notes. The Bankshares

---

20. The district court disposed of this allegation on an alternate basis as well. It found that the affidavits were "woefully inadequate in terms of specifics" as to this misrepresentation and that they did not meet the requirements of Fed.R.Civ.P. 56(e). See 476 F.Supp. at 949.

21. Defendants state their position as to the lack of consideration defense as follows:

To say that appellants were fraudulently induced to purchase the stock *is* to say that they failed to receive value for the notes. Any dispute over the wording of the issue is an exercise in semantics. The failure of value, or the fraudulent inducement, consists in the fact that the appellants were fraudulently induced to purchase worthless stock.
Brief of Defendants-Appellants at 37 [emphasis in original].

stock purchased in 1974, was of uncertain value and may have been worth less than the $5.50 purchase price; however, since Bankshares was still in operation at that time, its stock had some value. The fact that the stock became worthless later is irrelevant, as is the fact that it may not have been worth the price paid. "[M]ere inadequacy of consideration" is not a defense in this case. See *Home Savings Bank v. Gertenbach*, 270 Wis. 386, 71 N.W.2d 347, 352 (1955). The district court properly found that the defense of lack of consideration presented no genuine issue of material fact.[22]

For the reasons stated above we affirm the district court's granting of summary judgment in favor of the FDIC.

Affirmed.

---

**22.** *F.D.I.C. v. Meo*, 505 F.2d 790 (9th Cir. 1974), cited by defendants in support of their lack of consideration defense, is inapposite. In *Meo*, the plaintiff gave the bank his promissory note in exchange for stock. The bank did not properly execute his order, obtaining voting trust certificates for plaintiff, instead of stock. *Id.* at 791. The plaintiff thus did not receive what he had bargained for. In this case, the defendants wanted to purchase Bankshares stock and received that stock. There is no failure of consideration in this case.