Nancy SIMOS, Ann Mandelman and Carol Sampson, in their capacities as Co-personal representatives of Estate of Bernard J. Sampson, et al., Plaintiffs–Appellants,

v.

EMBASSY SUITES, INCORPORATED, Defendant–Appellee.

No. 92–1605.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 15, 1992.

Decided Jan. 14, 1993.

As Amended Jan. 27, 1993.

the WFIL or the notice and cure provisions of the WFDL. The Sampsons appeal, contending that questions of fact exist as to whether Embassy violated the WFIL or the WFDL. We affirm the district court's judgment.

Stephen E. Kravit (argued), David L. De-Bruin, Gregory A. Grobe, Scott Fleming, Weiss, Berzowski, Brady & Donahue, Milwaukee, WI, for plaintiffs-appellants.

Alan H. Silberman (argued), Karen B. Ksander, Sonnenschein, Nath & Rosenthal, Chicago, IL, Dennis M. Grzezinski, Angermeier & Rogers, Milwaukee, WI, for defendant-appellee.

Before CUMMINGS and MANION, Circuit Judges, and ZAGEL, District Judge.*

MANION, Circuit Judge.

Harold and B.J. Sampson (the Sampsons) entered into negotiations with Embassy Suites, Inc. (Embassy) to acquire a license to build a hotel in downtown Milwaukee. After the Sampsons made preliminary plans and paid Embassy $112,000 in application fees, Embassy terminated its commitment to issue a license agreement for the hotel. The Sampsons sued Embassy for violations of the Wisconsin Franchise Investment Law (WFIL) and the Wisconsin Fair Dealership Law (WFDL). The district court granted summary judgment in favor of Embassy, finding as a matter of law that the Sampsons were not entitled to damages under the anti-fraud provisions of

## I. Facts

Embassy, a national hotel chain, sells franchises to investors interested in developing hotel projects. The Wisconsin Commissioner of Securities (Commissioner) permitted Embassy to sell unregistered hotel franchises in the state on the condition that Embassy file a Uniform Franchise Offering Circular (Offering Circular) annually with the office of the Commissioner. The Offering Circular aided potential investors by providing them with important information about the planning, construction and operation of an Embassy Suites Hotel.

During the summer of 1986, the Sampsons applied for an Embassy Suites Hotel franchise to be located on Wells Street in downtown Milwaukee, Wisconsin. The application proposed that the Sampsons would manage the hotel. Along with the application, the Sampsons sent Embassy a $50,000 fee.[1] At about the same time, a different prospective franchisee, the Joel Lee Group, also applied for an Embassy Suites Hotel franchise to be located in Milwaukee. The Joel Lee Group application contemplated that Embassy would manage the hotel. Anticipating that Embassy would favor an application which allowed for corporate management,[2] the Sampsons offered to allow Embassy to manage the

---

\* Hon. James B. Zagel, District Judge for the Northern District of Illinois, is sitting by designation.

1. This fee is governed by Section 5 of the Offering Circular, which states in part:

 The initial fee (the "Fee"), one-half of which is payable when the application for a franchise is submitted and one-half when the Commitment Agreement to Issue a License Agreement (the "Commitment") is approved, is $500 per guest suite, with a minimum Fee of $100,000.00. . . .

 *If the application is withdrawn prior to a decision by the Franchisor or if the application is denied, the Fee is refunded,* without interest, less any expenses incurred by the Franchisor

in processing the application (including the cost of an independent market feasibility analysis). If the application is approved, the Fee becomes nonrefundable.
 (Emphasis added.)

2. The facts are in dispute as to how the Sampsons became aware that Embassy would favor corporate management—whether Embassy told them or whether they simply inferred as much from the circumstances. However, resolution of this fact question is not important for the purposes of reviewing the grant of summary judgment. All that is relevant is that the Sampsons became aware of Embassy's preference and proceeded to act accordingly.

hotel once built, effectively amending their application.

Embassy considered both applications and notified the Sampsons by a letter dated January 9, 1987 that their application for a hotel on Wells Street "was granted subject to the execution of a management agreement with Embassy." Along with the letter, Embassy sent a Commitment Agreement (Commitment) which bound Embassy to issue a license for a hotel upon the Sampsons' compliance with a development timetable. That timetable required in part that construction begin on the new hotel by January 9, 1988. The Commitment contained no provision relating to the management agreement referred to in the letter. The Sampsons executed the Commitment on February 18, 1987, and paid to Embassy $62,500, which represented the second and final payment of the initial fee. *See supra* n. 1. Embassy then sent to the Sampsons its Standards Manual, which set forth certain standards for the hotel and included the service marks and logos which would ultimately be used in the business of the hotel.

Between February and July of 1987, the Sampsons engaged in pre-construction activities including marketing analysis, architectural planning, financing analysis and construction planning. Sometime around this period the Sampsons notified Embassy of their interest in an alternative hotel site on Wisconsin Avenue in downtown Milwaukee. In a letter dated August 3, 1987, Embassy arranged to meet with the Sampsons to discuss the Wisconsin Avenue proposal. On August 26, the parties met as scheduled and visited the suggested new location. Embassy agreed to consider the possibility of a Wisconsin Avenue location if the Sampsons could gain control of the site from its owner, the City of Milwaukee (the City). Also during the August 26 meeting, the parties engaged in unsuccessful negotiations regarding the terms of the management agreement.

Soon thereafter, the City sent the Sampsons a letter expressing a willingness to explore the possibility of a hotel project at the Wisconsin Avenue location. The Sampsons forwarded that letter to Embassy. In a letter dated September 21, 1987, Embassy reiterated to the Sampsons that it would only consider a location change if the Sampsons could gain control of the site from the City. In the same letter, Embassy requested comments on a proposed management agreement. On October 1 and October 20, the Sampsons sent two more letters requesting that Embassy take action on the proposed site change. By a letter dated November 9, Embassy reminded the Sampsons that the Commitment would lapse unless they began construction by the January 9, 1988 deadline. That letter also outlined the requirements to obtain an extension of the Commitment, setting a November 25, 1987 deadline to satisfy those requirements. Again on December 18, Embassy wrote to the Sampsons to remind them of the January 9 construction deadline.

The Sampsons did not begin construction of the hotel by January 9, and on February 15 Embassy wrote to the Sampsons informing them of Embassy's decision that the Commitment should be terminated. Embassy sent another letter dated March 9 notifying the Sampsons that the Embassy franchise committee had terminated the Commitment. The Sampsons filed this suit on April 8. On April 22, Embassy wrote to the Sampsons to indicate that the effective date of the termination would be on August 1, 1988, and that the Sampsons could obtain an extension of the Commitment by taking the necessary steps before July 1, 1988. The Sampsons responded to that letter through their attorneys stating that they were unwilling to restart the project.

On January 6, 1989, the Sampsons filed an Amended Complaint, asserting claims based upon Embassy's alleged violation of the anti-fraud provisions of the WFIL and the notice and cure requirements of the WFDL, as well as claims for fraudulent misrepresentation, breach of contract and promissory estoppel. Embassy moved for summary judgment in the district court on the WFIL and WFDL claims. The district court granted that motion, finding as a matter of law that Embassy did not violate the anti-fraud provisions of the WFIL, and

that the notice and cure provisions of the WFDL were inapplicable because no dealership relationship existed between the Sampsons and Embassy. The Sampsons then dismissed their claims for fraudulent misrepresentation, breach of contract and promissory estoppel, and obtained a final summary judgment on the WFIL and WFDL claims. They appeal that final judgment.

## II. Analysis

From a detailed set of facts, two very narrow issues remain on appeal: 1) whether Embassy violated the anti-fraud provisions of the WFIL, and 2) whether the WFDL applied to the relationship between the Sampsons and Embassy such that the notice and cure provisions of the WFDL would be binding upon Embassy. We shall consider each issue separately.

### A. Fraud Under the WFIL

Under the express terms of the Commissioner's order, the Offering Circular was to be prepared "in the form required by SEC 32.02, Wis.Adm.Code or disclosure document prepared in the form required by 16 CFR 436." Section 32.02 provides that the Offering Circular should be prepared in accordance with guidelines promulgated by the North American Securities Administrators Association (NASAA Guidelines). Both the NASAA Guidelines and 16 CFR § 436.1 generally prohibit unfair and deceptive practices in connection with the Offering Circular.

The provision of the WFIL dealing with fraudulent practices states in part:

> (1) No person may make or cause to be made, in any document filed with the commissioner or in any proceeding under this chapter, any statement which is, at the time and in the light of the circumstances under which it is made, false or misleading in any material respect or, in connection with any statement required to be made under s. 553.31(1), omit to state a material fact necessary in order to make the statement made, in the light of the circum-

> stances under which they are made, not misleading.

> (2) No person may violate any order of the commissioner or condition therein of which the person has notice.

> (3) No person may offer, purchase or sell a franchise in this state by means of any written or oral communication not included in sub. (1) which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading....

Wis.Stat.Ann. § 553.41(1), (2), (3).

The Sampsons argue that Embassy violated subsections 1 and 3 by making false or misleading statements or omissions in the Offering Circular relating to Embassy's willingness to allow self-management of its hotel franchises. Under the Sampsons' theory, these alleged misstatements and omissions in turn violate subsection 2's prohibition against violating an order of the Commissioner, because the Commissioner required that Embassy prepare the Offering Circular in accordance with the NASAA guidelines and the regulations found at 16 CFR § 436.1, both of which contain anti-fraud provisions.

 In order to prevail under any of these provisions, the Sampsons need to demonstrate that Embassy made false or misleading statements or omissions in the Offering Circular—this is a common element to all three theories which the Sampsons advance. The district court efficiently disposed of the Sampsons' claims under all three provisions by concluding that Embassy made no false or misleading statements or omissions in the Offering Circular. This conclusion eliminated any claim for misstatements or omissions under subsections 1 and 3, and further eliminated the claim under subsection 2 that Embassy violated the Commissioner's order by committing fraud. We review the district court's conclusion that Embassy did not violate the anti-fraud provisions of the WFIL under a *de novo* standard. *See Diesel Service Co.*

*v. AMBAC Int'l Corp.*, 961 F.2d 635, 636 (7th Cir.1992).

### 1. Misrepresentations

The Sampsons allege that statements made in sections 8 and 15 of the Offering Circular effectively represent that Embassy would permit franchisees to self-manage the hotels.[3] Section 8, however, deals with the degree to which a franchisee may be required to purchase services from the franchisor. Nothing in section 8 addresses the issue of management, and we cannot imagine how section 8 could be read as a statement related to self-management. Section 15 of the Offering Circular requires a franchisee to participate in the actual operation of the hotel. Under this provision, the franchisee is not required to participate in the direct operation of the hotel and its business, but may hire a general manager of his own choice and generally must exercise some degree of management control over the hotel. Because the provisions in Section 15 refer to the management of the hotel, although not in the specific way portrayed by the Sampsons,[4] we will consider whether they are false or misleading.

■ The Sampsons argue that Embassy's later disclosed preference for corporate management necessarily renders the statements in Section 15 to be false or misleading. But even if the representations in the Offering Circular are read in the way the Sampsons desire—as definitively stating that Embassy allows self-management of the hotels—the statements are not rendered false or misleading by Embassy's later disclosed preference for corporate management. Just because Embassy may have preferred corporate management does not make Section 15's stated allowance of self-management false or misleading. Embassy could well have preferred the one, but nevertheless allowed the other.

■ The clear wording of Section 15 conveys an obligation on the part of the franchisee to participate in the management of the hotel. There is no evidence that Embassy's preference for corporate management foreclosed any participation in management by the Sampsons. In fact, Embassy sought to enter into a management agreement in which the Sampsons could have negotiated the degree of their participation in the management of the hotel. Because the parties never completed the management agreement, it is unclear whether Embassy would have prohibited the Sampsons from participating in management.

Even assuming that Embassy had entered into a management agreement which totally precluded the Sampsons from any participation in management, this would not render the statements of Section 15 to be false or misleading. Section 15 imposes a future obligation upon a franchisee to participate in the management of the hotel. Nothing would prevent Embassy from voluntarily waiving this obligation, and negotiating the right to exclusively manage the hotel. The announcement of an obligation relates to a future event which does not become fraudulent if the obligation is subsequently waived. *Cf. Federal Deposit Ins. Corp. v. Lauterbach*, 626 F.2d 1327,

---

**3.** Section 8 provides:

The franchisee is not required to purchase or lease goods, services, supplies, furniture, fixtures, equipment, signs, inventory, or real estate from the Franchisor or its designees. Section 15 provides:

The franchisee must at all times retain and exercise management control over the hotel and its business, unless otherwise approved by the Franchisor.

The Franchisor does not require the franchisee to participate personally in the direct operation of the hotel and its business. The franchisee may hire a general manager of his own choice without prior approval of the Franchisor. The general manager will be required to attend Franchisor's required training programs (Training is discussed in Section 11 of this offering circular).

**4.** The Sampsons allege that Embassy made false representations in its Offering Circular by stating that "the franchisee would be permitted to self-manage the hotel." We note that the Sampsons fail to identify exactly where in the Offering Circular such a statement is made. In reviewing the Offering Circular, we could not find such a definite statement. We assume that the statement identified is merely the Sampsons' own interpretation of Section 15.

1334 (7th Cir.1980) (false representation must relate to present or preexisting events or facts and may not be mere prediction of future events).

## 2. Omissions

Having concluded that no false or misleading statements were made in the Offering Circular, we next turn to whether Embassy violated the anti-fraud provisions of the WFIL by "omit(ing) to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." Wis.Stat.Ann. § 553.41(1) and (3). The Sampsons contend that Embassy's failure to disclose its preference for corporate management in the Offering Circular was such an omission.

■ However, the stated purpose of the Offering Circular was to provide a "SUMMARY ONLY OF CERTAIN MATERIAL PROVISIONS OF THE FRANCHISE AGREEMENT." The Offering Circular did not purport to speak on the criteria Embassy would use in choosing between competing applications; it was silent on this issue. Nothing in the Offering Circular can be read as giving the impression that Embassy would more highly regard an application which allowed self-management. If Embassy had somehow given that impression, then it might have had an affirmative duty to clarify its position by including the statement that when judging competing applications, it prefers the one which allows for corporate management. *Cf. In re Estate of Lecic,* 104 Wis.2d 592, 312 N.W.2d 773, 779 (1981) (a failure to disclose a fact constitutes misrepresentation only when the nondisclosing party has a duty to disclose the fact; the question of legal duty to disclose is a question of law). Because the Offering Circular did not even purport to speak on Embassy's criteria for judging competing applications, Embassy possessed no duty to include a statement in the Offering Circular clarifying its position in this regard.[5]

## 3. Reliance

■ Under the WFIL, " '(f)raud' and 'deceit' are not limited to common law fraud or deceit." Wis.Stat.Ann. § 553.03(8). Therefore, the element of detrimental reliance usually essential in a common law fraud case is not necessarily required under section 553.41. However, the enforcement provisions of the WFIL essentially write the element of detrimental reliance into the statute. Sections 553.51(1) and (2) preclude liability for violation of sections 553.41(1), (2) and (3), if the defendant proves that the plaintiff knew the facts concerning the untruth or omission.

■ Here, the Sampsons claim to have known of Embassy's alleged failure to disclose its preference for corporate management at least when the Sampsons effectively amended their application to allow for corporate management. At that time, the Sampsons could have withdrawn their application and would have then been entitled to a refund of the $50,000 fee which they had already paid. *See supra* n. 1. Instead, the Sampsons continued without apparent hesitation to pursue a franchise. From this action it is clear that the Sampsons did not rely upon the alleged false or misleading statements or omissions when applying for the franchise. *Cf. Collins v. Eli Lilly Co.,* 116 Wis.2d 166, 342 N.W.2d 37, 54 (1984) (there can be no recovery for fraud when there was no reliance on the misrepresentation).

## B. Dealership

■ The Sampsons next argue that they are entitled to recover for Embassy's alleged failure to comply with the notice and

**5.** The Sampsons also contend that Embassy committed fraud by omission outside of the Offering Circular in failing to disclose its intent to negotiate the management contract in bad faith and to negotiate onerous terms. In order to prevail on such a claim, the Sampsons would at least have to prove that Embassy possessed a present intent at the time it approved the application to negotiate onerous terms. *Hoffman v. Red Owl Stores, Inc.,* 26 Wis.2d 683, 133 N.W.2d 267, 273 (1965). Embassy has failed to direct this court to any such evidence, and summary judgment was therefore appropriate on this point. *See Valentine v. Joliet Township High School Dist.,* 802 F.2d 981, 989 (7th Cir.1986).

cure provisions of the WFDL. The district court disposed of this argument by finding as a matter of law that the Sampsons were not a dealer under Wisconsin law, and therefore not entitled to protection under the WFDL. We review *de novo* the district court's conclusion of law in granting summary judgment on this issue. *Frieburg Farm Equipment, Inc. v. Van Dale, Inc.*, 978 F.2d 395, 398 (7th Cir.1992).

The WFDL defines dealership as follows:

(3) "Dealership" means a contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis.Stat.Ann. § 135.02.

■ The district court determined that no dealership existed under the WFDL because it was too early in their relationship for the Sampsons and Embassy to enjoy a sufficient community of interests. The parties have not cited nor have we found any Wisconsin case that addresses at what point in a business relationship a shared interest in some prospective business goal ripens into a community of interest in the offer, sale or distribution of goods or services, such that a dealership is created. Absent clear direction on this issue from the courts of Wisconsin, we interpret the meaning of the statute according to its express terms. *See Bob Willow Motors, Inc. v. General Motors Corp.*, 872 F.2d 788, 793 (7th Cir.1989).

■ We conclude that there can be no community of interest in the offer, sale or distribution of goods or services when there are not yet goods or services to offer, sell or distribute. At the point in their relationship when the Commitment lapsed, the Sampsons and Embassy enjoyed only a community of interest in the planning and construction of a hotel. Whether the hotel ever rented a room was contingent upon the success of the parties in carrying out their respective obligations in building the hotel. The Commitment expressly recognized the contingent nature of this relationship, by providing a timetable for the construction of the hotel and by conditioning the issuing of a license to operate the hotel upon the Sampsons' strict compliance with the timetable. There can be no community of interests in the sale of services not yet in existence, especially when the availability of those services is dependent upon the happening of some uncertain condition—in this case, the building of the hotel.[6]

The caselaw defining community of interest for the purposes of the WFDL supports this court's position. In *Ziegler Co., Inc. v. Rexnord, Inc.*, 139 Wis.2d 593, 407 N.W.2d 873 (1987), the Supreme Court of Wisconsin discussed extensively the meaning of community of interests as used in the WFDL. The court rejected a rigid "mathematical" definition, and instead identified two guideposts to determine whether a community of interests exists. First, the court concluded that the statutory framework of the WFDL requires at least that the grantor and dealer possess a "continuing financial interest" in their business relationship. *Id.*, 407 N.W.2d at 878. "This requirement contemplates a shared financial interest in the operation of the dealership or the marketing of the good or service." *Id.* Second, the court determined that the phrase community of interests requires a "likeness or

---

**6.** We are not persuaded by the Sampsons' argument that the use of derivatives of the words "franchise" and "dealer" in certain documents relevant to the relationship between Embassy and the Sampsons necessarily creates a grant- or/dealer relationship. The statutory definition of dealership controls whether parties may avail themselves of the protection of the WFDL, and we restrict our analysis to that definition.

similarity of interest in the common business in which the dealer and the grantor *are* engaged", a characteristic which the court identifies as "interdependence". *Id.,* 407 N.W.2d at 879 (emphasis added). In assessing whether parties have achieved a shared financial interest and interdependence, the court instructs that the following factors should be considered:

> (H)ow long the parties have dealt with each other; the extent and nature of the obligations imposed on the parties in the contract or agreement between them; what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; the extent and nature of the alleged grantor's grant of territory to the alleged dealer; the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; the personnel which the alleged dealer devotes to the alleged dealership; how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.

*Id.,* 407 N.W.2d at 879–880.

█ At the time the Commitment lapsed, the Sampsons and Embassy had dealt with each other for about one year. The subject of their relationship during that period was the planning construction of a hotel in Milwaukee. The contract between them contemplated that the license to operate the hotel would issue only after the construction was complete. Although the Sampsons spent time and effort in planning the hotel, they never obtained a license to operate it. Because they never operated a hotel, the Sampsons never devoted time to the business of renting rooms, which was the business of Embassy. They never gained proceeds or profits from the business of Embassy; never assumed a territory; never used Embassy's proprietary marks in the marketing of hotel rooms; never actually invested in a building or other facility; and never contributed to the good will of the business of running an Embassy hotel. There were no hotel employees, no hotel advertising, and no hotel services. In short, although the parties envisioned that their relationship might some day blossom into one of continuing financial interest and interdependence, at the time the Sampsons failed to comply with the timetable set forth in the Commitment, there was neither.

At oral argument, counsel for the Sampsons compared his client's relationship with Embassy to that enjoyed by the Florida Marlins and Colorado Rockies with major league baseball. He argued that even though these expansion franchises have not yet played a game, nobody would deny them the status of franchise and therefore dealer in the commodity of the national pastime. Although there is no record evidence relating to the operation of these teams, we note based upon our review of the sports pages that both teams have stadiums, season ticket holders, some players, uniforms, and some structure of management. They are both definitely scheduled to play ball this spring. At the time the Sampsons allowed the Commitment to lapse, there were no such indicia of a dealership—no hotel, no guests, no lobby, no desk clerks. As a matter of law, there was no dealership between the Sampsons and Embassy.

## III. Conclusion

We agree with the district court that Embassy did not violate the anti-fraud provisions of the WFIL and that the Sampsons were not a dealership and therefore could not avail themselves of the protection of the WFDL. We therefore affirm the grant of summary judgment in favor of Embassy.

AFFIRMED.